**MEDTRONIC, INC., Plaintiff-Appellee,**

v.

**Charles F. BENDA, Emil Conde and William C. Cain, Defendants-Appellants.**

**Nos. 82–1021, 81–1212.**

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1982.*

Decided July 13, 1982.

Certiorari Denied Jan. 10, 1983.

See 103 S.Ct. 731.

---

* This appeal was originally decided by unreported order on July 13, 1982. See Circuit Rule 35.

The Court has subsequently decided to issue the decision as an opinion.

Anthony J. Murray, Philip J. Schmidt, Chicago, Ill., F. Joseph Jaskowiak, Hoeppner, Wagner & Evans, Valparaiso, Ind., for defendants-appellants.

James B. Loken, Minneapolis, Minn., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and GRANT,** Senior District Judge.

GRANT, Senior District Judge.

This is a consolidated action brought by Medtronic, Inc. ("Medtronic") against the defendants, three former employees, seeking to enforce restrictive covenants contained in employment contracts signed by each. The district court entered a detailed set of factual findings (Appendix A) which we fully adopt and incorporate herein.

This appeal centers upon the district court's holding that the restrictive covenants in question are valid and enforceable under Illinois law. Each appellant has filed separate briefs raising every conceivable argument "under the sun." The following three arguments constitute the crux of their case.

1. The district court's finding that Medtronic possessed a protectible interest based upon a long-term, near permanent clientele is clearly erroneous.

2. The restrictive covenant is defective in that it contains no geographical limits and the enforcing injunction is vague and overly broad in violation of Fed.R.Civ.P. 65.

3. The injunction entered by the district court is in conflict with the public interest.

We reject these arguments and affirm the decision of the district court for the reasons set forth therein. We add the following

** Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, sit-

discussion in response to the specific arguments noted above.

I.

The district court explicitly stated that the existence of a protectible employer interest in this case was not based upon the appellants' acquisition and possession of confidential information, but upon "Medtronic's long term relationships with its customers." Mem. Op. at 12. The appellants contend this conclusion is clearly erroneous because Medtronic presented no evidence which supports such a conclusion. They further assert that the evidence establishes the opposite; that many hospitals and physicians became Medtronic's customers only after the appellants began employment with Medtronic. Thus, they argue, there were no long-term relationships with whom they would not have come in contact except for their employment with Medtronic.

The standard of review we are bound to apply was recently summarized by the Supreme Court.

In reviewing the factual findings of the District Court, the Court of Appeals was bound by the "clearly erroneous" standard of Rule 52(a), Federal Rules of Civil Procedure. [cite omitted]. That rule recognizes and rests upon the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence. [cite omitted]. Because of the deference due the trial judge, unless an appellate court is left with the "definite and firm conviction that a mistake has been committed," [cite omitted], it must accept the trial court's findings.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* —— U.S. ——, ——, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982) (footnote omitted). While there is evidence indicating that some hospitals and physicians became Medtronic customers only after the appellants joined Medtronic, there also is evidence indicating otherwise. *See* Rebut-

ting by designation.

tal Testimony of Raich. We are not in the position of substituting our own judgment of the evidence for that of the district court's. The record contains conflicting evidence on the "long-term, near permanent clientele" issue and the district court reasonably credited evidence adverse to the appellants. We are not left with a "definite and firm conviction that a mistake has been committed" and must, therefore, conclude that the district court's finding is not clearly erroneous.

■ In this same regard, the appellants challenge the district court's finding that physicians are Medtronic customers. The record amply supports this conclusion inasmuch as the physicians were the "real" purchasers of the pacemakers even though the formal sale was made, in most cases, to the hospital. The district court correctly focused upon the substance of the sales transactions and not their form. Appellants cannot seriously dispute the fact that it is primarily the physician who influences and even decides which pacemaker from which manufacturer will be purchased by the hospital. Not only is this finding not clearly erroneous, but it is correct. This conclusion is also supported by the decision in *Medtronic, Inc. v. Gibbons*, 527 F.Supp. 1085, 1094 n.3 (D.Minn.1981), wherein the court stated:

> The ultimate consumer of pacemakers are cardiac patients, not hospitals or doctors. But the pacemakers are sold by the manufacturers to the hospital where the patient is being treated. The hospital purchases pacemakers on recommendations from a physician or other medical personnel treating a patient. Medtronic's sales effort focuses on the physicians and medical personnel. Thus, the term "customers" must include not only the hospital, which actually pays for the product, but also the physicians and surgeons who recommend which product to purchase.

■ One last point needs to be addressed. Defendants suggest in their briefs that a "long-term, near permanent clientele" cannot be found to exist unless there is present an exclusive relationship. They argue that inasmuch as hospitals and physicians who were Medtronic customers were free to purchase pacemakers from other manufacturers and did so in some cases, they could not be considered long-term nor permanent. We must reject this argument based upon the authority of *Morrison Metalweld Process Corp. v. Valent*, 97 Ill.App.3d 373, 52 Ill.Dec. 825, 828–29, 422 N.E.2d 1034, 1037–38 (1981). There is no support for the narrow interpretation asserted by the defendants. Exclusivity is simply not required.

For the reasons articulated by the district court as well as those just discussed, we hold that the record in this case sufficiently supports the district court's finding of a legitimate and protectible employer interest.

## II.

The second argument raised by the defendants is that the restrictive covenant is not reasonable in scope in that it contains no geographical limits. They also argue that the injunctive relief ordered by the district court fails to adequately specify what conduct is prohibited and what conduct is not. Furthermore, they contend that the district court's order encompasses conduct which the covenant is not intended to prohibit.

■ Appellants are correct in stating that the covenant and the district court's order contain no geographical limitations. However, this is not fatal in the business context in which this covenant arises. Where the covenant's restriction relates to the solicitation of customers, the absence of a geographical limitation is not unreasonable. The decisions of the Illinois Appellate Courts in *Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 27 Ill.Dec. 892, 899–900, 389 N.E.2d 1300, 1307–08 (1979) and *Wolf & Co. v. Waldron*, 51 Ill.App.3d 239, 9 Ill.Dec. 346, 366 N.E.2d 603 (1977), are squarely on point. The one year limitation, in light of the amount of time needed to adequately retrain another salesperson, is also reasonable to protect Medtronic's interest.

The vagueness and overbreadth arguments can for practical purposes be merged in this case. It would be impossible for any court to identify every conceivable act that would be covered by the restrictive covenant. All that is required under Fed.R. Civ.P. 65(d) is for the language of the injunction to be as specific as possible under the totality of the circumstances, such that a reasonable person could understand what conduct is proscribed. *City of Mishawaka v. American Electric Power Company, Inc.*, 616 F.2d 976, 991 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981). We believe the district court has satisfied this requirement. A plain reading of the injunction reveals that any contacts associated to any degree with the possible sale of pacemakers, with either hospital officials or physicians with whom the appellants had contact in the year prior to their leaving Medtronic, are prohibited. On pages 654 and 655 of its decision, the district court elaborates on the prohibition by identifying several specific acts which are covered. This elaboration helps to clarify the boundaries of the injunction. We believe the injunction is as specifically and clearly framed as possible in light of the commercial environment in which it arises and is being applied. The appellants are placed on adequate notice regarding permissible and impermissible conduct. They are, of course, always free to seek a more detailed statement if they so choose. *See American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 171 (2d Cir. 1978). But it is our conclusion that the language of the injunction is sufficiently definite and specific to guide the appellants in their business affairs and to apprise them of the injunction's scope and to safeguard the interests of all parties. Their claim to the contrary is really an unsuccessful attempt to subvert the covenant's prohibitions which are reasonable and enforceable in this case.

## III.

The last argument made by the appellants is based upon public policy considerations. They claim that public health and welfare are seriously endangered by the limitations placed upon their business activities, thereby rendering the restrictive covenant unreasonable. There is evidence in the record which tends to support appellants' factual assertion that hospitals and physicians who otherwise would seek assistance from the appellants would consider it a loss not to be able to continue to seek assistance from the appellants. But we cannot accept appellants' proposition that this evidence establishes that the public interest is significantly harmed as a result. There is nothing to indicate that the quality of medical care would suffer by enforcement of the restrictive covenant. This same argument was made and rejected in *Medtronic, supra*, 527 F.Supp. at 1095. The reasoning of the district court there is equally applicable to this case.

Gibbons argues that the public interest of making sure that all patients receive the best medical care available would be seriously hampered by restraining Gibbons. He would be limited in assisting doctors in implantations of pacemakers and from giving seminars to nurses and other hospital personnel. Although Gibbons does perform some beneficial public services by taking part in surgeries and giving seminars, he is primarily a salesman, not a doctor or an educator. His activities contribute to improving the quality of health care, but his temporary absence from a portion of his sales area would not seriously deteriorate the quality of health care in that area. In addition, Gibbons argues that restraining him may tend to reduce the competition for biomedical devices in his sales area. However, there is substantial competition in the pacemaker industry, and Pacesetter has only a minor portion of the market for pacemakers in northern California. Restraining Gibbons in the limited way available under the restrictive covenant would not seriously affect the competition in the industry. The public interest only slightly favors Gibbons, and is not nearly strong enough to prevent issuance of an injunction in view of the strength of the other three prongs of the *Dataphase* test.

While the appellants have played some role in the disbursement of medical care, the record shows that their impact is simply not as significant and essential as they would have the court believe. They are not an indispensable element whose absence will result in immediate and dangerous consequences. The pacemakers which they sell can still be sold to anyone their new employer chooses to contact, including Medtronic's customers. The only restriction is that they cannot do the selling. And while their personal services may be desired and helpful, there is no evidence indicating that services of equal quality and quantity are unavailable. Furthermore, the restriction is effective for only one year. Under these circumstances, we cannot agree that the public interest suffers from enforcement of the restrictive covenant.

The identical argument was made in *Canfield v. Spear*, 44 Ill.2d 49, 254 N.E.2d 433, 435 (1969), with the employee there being a physician. The court stated:

> Nor is the contract injurious to any legitimate interest of the public. Defendant can be as useful to the public at some other place in the State as he can in Rockford, and the health of persons elsewhere is just as important. It cannot be said that the public interest is adversely affected if a physician decides to move from one community to another, nor does it become so if the move results from some agreement made in advance. If a severe shortage exists in any particular place young doctors will tend to move there, thus alleviating the shortage.

These considerations are equally applicable here. Appellants seem to believe that all of their business activities are prohibited. That is simply not true. There is nothing to indicate that needs previously served by the appellants cannot be served by others or that there is a shortage of salespersons possessing the skills and abilities of the appellants. Only the appellants' interests are implicated by enforcement of the restrictive covenant, not the public's. They voluntarily contracted for the obligations they now must fulfill and the district court has given full and proper effect to those obligations.[1]

## IV.

Appellants Benda and Conde filed jury demands with the district court in this case. The requests were denied and only Benda appeals from that decision. We find no merit in his argument and adopt the district court's November 9, 1981 decision in its entirety (Appendix B). We only add that the district court did not, contrary to Benda's apparent impression, deny him a jury trial on his federal antitrust claim. The manner in which the district court handled these cases was reasonable and proper.

For all these reasons, the judgment of the district court is AFFIRMED.

## APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

MEDTRONIC, INC.,

               Plaintiff,

-vs-       No. 81 C 5029

CHARLES F. BENDA,

               Defendant.

MEDTRONIC, INC.,

               Plaintiff,

-vs-       No. 81 C 5030

EMIL CONDE,

               Defendant.

MEDTRONIC, INC.,

---

1. Upon joining Intermedics, the appellants signed employment contracts which contained restrictive covenants very similar to those contained in their Medtronic employment contracts. It is somewhat puzzling why they would sign such agreements if they seriously disputed the necessity and enforceability of the clauses.

Plaintiff, )
)
-vs- ) No. 81 C 5051
)
WILLIAM C. CAIN, ) (Consolidated)
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Medtronic, Inc. ("Medtronic"), brought separate diversity actions for declaratory and injunctive relief against three of its former employees, Charles F. Benda, Jr. ("Benda"), Emil Conde ("Conde"), and William C. Cain ("Cain"), to enforce certain noncompetition agreements which the three had signed while employed by Medtronic. On September 4, 1981, temporary restraining orders were entered against Benda and Conde, which orders have since expired. On September 8, 1981, the actions against all three defendants were consolidated for discovery purposes, and on September 24, 1981, they were consolidated for all purposes, including trial. Trial was held from November 9 through November 16, 1981. During the course of the trial, the court entered an order restraining the defendants from violating the non-competition agreements pending the outcome of the trial, which order has continued to be in effect to the date of this opinion, except as modified by an order of the Seventh Circuit Court of Appeals, dated January 21, 1982. This court has reviewed the transcript of the trial as well as the relevant exhibits, and hereby enters the following findings of fact and conclusions of law.

### I. Findings of Fact

Medtronic is a Minnesota corporation with its principal office and manufacturing facilities located in Minneapolis, Minnesota. Medtronic is engaged, *inter alia*, in the manufacture and sale of implantable cardiac pacemakers (hereinafter "pacemakers") and related devices and equipment. The defendants, Benda, Conde and Cain, are all former sales representatives for Medtronic.

Benda became a Medtronic employee on April 11, 1977. Benda is a college graduate, and had several years of sales experience prior to joining Medtronic. Conde became a Medtronic sales representative on or about August 1, 1977. Conde had previously attended college for two years and, like Benda, had several years of medical sales experience before his association with Medtronic. Cain joined Medtronic on September 1, 1977. Cain is also college educated, and he, too, had worked as a sales representative prior to joining Medtronic. None of the defendants was hired for a specific term of employment. All were employed at will.

Subsequent to being hired by Medtronic, each of the defendants was assigned a specific geographic territory within the greater Chicago metropolitan area (extending into Indiana in the case of defendant Conde). All three were then given extensive videotape and classroom training in the sciences and sales. Medtronic supplemented this training with self-directed study materials, and also with additional training in the field, where the salesmen were coached in sales technique, and also attended the surgical implantations of pacemakers, as it was a common practice for Medtronic salesmen to attend such surgeries. All of the defendants were trained by Medtronic to be skilled sales professionals, not merely "order takers." The initial training period for a Medtronic sales representative, although not susceptible of precise definition, was between one and six months.

As sales representatives for Medtronic, the defendants were responsible for persuading physicians and surgeons in their respective territories to prescribe and implant Medtronic pacemakers in their patients.[1] To effect that objective, the salesmen provided physicians with a wide range of services outside of the actual "sale" of the pacemaker. For instance, the defendants often counselled doctors regarding the selection of pacemakers for particular pa-

---

1. Although pacemakers are usually purchased by hospitals, not doctors, the prescribing physicians and surgeons are the individuals who effectively choose which brand to implant. Therefore, they are the primary focus of the salesman's attention.

tients, and actually attended the surgical implantation of pacemakers, often on short notice, in order to provide physicians with continuing technical assistance. The defendants also arranged new product demonstrations for doctors and hospitals in their respective territories, and sometimes arranged to fly physicians to Minnesota to tour Medtronic's manufacturing facilities. In addition, the defendants often entertained doctors and hospital staff members, at Medtronic's expense. Pacemaker sales, as practiced by Medtronic, were characterized by close personal and professional relationships between the pacemaker sales representative and the prescribing physicians and surgeons.

When each of the defendants joined Medtronic, he executed an employment agreement (hereinafter the "old agreement"), which contained a restriction of competition with Medtronic at the conclusion of his employment. The restriction provided:

"For 360 days after my employment, I will not attempt to divert any Company business by influencing customers with whom I or my subordinates were connected [during] the last year of my employment."

Late in September, 1977, each of the defendants signed a revised employment agreement (the "revised agreement"), which contained, among other things, a revised restriction on post-termination competition. In relevant part, the revised agreement provided:

"In consideration of my employment, continued employment, promotion or increase in compensation by the Company, I hereby agree as follows:

.    .    .    .    .

5(b).
"For 360 days after termination of my employment with the Company, I will not attempt to divert any Company business

by soliciting, contacting or communicating with any customers for the Company's products with whom I, or employees under my supervision, had contact during the year preceding termination of my employment"

Benda signed the revised agreement on September 23, 1977, Conde on September 29, 1977, and Cain on September 27, 1977. Each of the revised agreements was also signed by David Raich, the Chicago District Manager for Medtronic (and the defendants' immediate superior), and Dale Olseth, Medtronic's president and chief executive officer.

In return for signing the revised agreement, each of the defendants continued to be employed by Medtronic. At the time the defendants signed, Medtronic also changed its method of compensating its salesmen, replacing a "quota" method with an "eight quarter rolling average method" or "EQRA." That change resulted in increased compensation for each of the defendants. The change in compensation, although announced in late September, 1977, was made retroactive to August 1, 1977.[2]

Benda resigned from Medtronic on August 31, 1981, Conde resigned on September 2, 1981, and Cain resigned on September 4, 1981. All three defendants are now independent pacemaker sales representatives for Intermedics, Inc., a competitor of Medtronic.[3]

Each of the defendants accepted an identical compensation package from Intermedics, consisting of a "salary support" program of up to two years duration, followed by commission compensation equal to 15% of Intermedics' gross sales in his assigned Intermedics territory. The salary support program consists of:

Two years' guaranteed salary of $100,000 per year;

---

**2.** Because of the retroactivity of the change in compensation, Cain and Conde were actually never compensated under the quota method, although they were employed while that method was in effect.

**3.** To be precise, defendant Benda is now employed by Cardio Care Systems, Inc., a corporation which he created just after he left Medtronic. Cardio Care is an independent contractor for Intermedics.

Reimbursement of all business-related expenses, plus a monthly car allowance of $600;

A $5,000 bonus for the sale of the first ten Intermedic's pacemakers in each defendant's "territory;"

Reimbursement of all legal fees incurred in litigation with Medtronic.

Intermedics has assigned the defendants both temporary and permanent territories. Each defendant's permanent territory consists largely of the hospitals which were in his former Medtronic territory, and each defendant's temporary territory consists only of hospitals outside of his former Medtronic territory. Each defendant agreed to work in his temporary territory until 360 days had elapsed following his resignation from Medtronic, or until such time as a court ruled that he may reenter his former territory. Benda's temporary territory consists largely of Cain's former Medtronic territory, Cain's temporary territory consists mainly of Conde's former Medtronic territory, and Conde's temporary territory consists mainly of Benda's former Medtronic territory.

Notwithstanding the fact that none of the defendants' temporary Intermedics' territories requires that he reenter his former Medtronic territory, since resigning from Medtronic all three of the defendants have had numerous contacts with hospitals and doctors from their former Medtronic territories. Benda's contacts include: (1) the sale of Intermedics pacemakers to doctors whom he had formerly contacted for Medtronic; (2) attendance at surgeries performed in his former Medtronic territory at which Intermedics pacemakers were implanted; and (3) personally introducing defendant Conde to some of the individuals upon whom Conde would be calling as the temporary Intermedic salesman in Benda's territory. Conde's contacts in his former Medtronic territory consist primarily of visits, lunches and dinners with various doctors whom he had contacted for Medtronic. On most of those occasions, Code [sic] discussed the qualifications of defendant Cain, who was the temporary Intermedics sales-

man in Conde's territory. Conde did not sell the doctors Intermedics pacemakers, however, and there was no evidence that he has attended surgeries in his former Medtronic territory since resigning. Defendant Cain's contacts with his former Medtronic territory have been extensive. They include: (1) dropping off his new Intermedics business cards at at least nine of the hospitals in his former Medtronic territory; (2) the sale of Intermedics pacemakers to doctors whom he had formerly contacted as a Medtronic employee; (3) attendance at surgeries performed in his former Medtronic territory at which Intermedics pacemakers were implanted; and (4) arranging Intermedics product demonstrations in his former Medtronic territory.

As a result of the above contacts and communications, the court finds that Medtronic has been injured, although the extent of the harm is not susceptible of quantification. During September and October, 1981, Medtronic experienced a drop in sales in its Chicago District office of nearly 100 pacemakers. Pacemakers cost an average of $3,500 apiece. The court concludes that at least a portion of Medtronic's loss is attributable to the defendants' actions.

## II. Conclusions of Law

The two central issues in this case are the enforceability of the non-competition clause contained in the revised employment agreement and, if the clause is found to be enforceable, the interpretation of certain language contained in that provision. First, the court will address the issue of enforceability.

### A. Enforceability of the Non-Competition Agreement

Under Illinois law, a restrictive covenant in an employment contract is enforceable where the employer demonstrates the existence of: (1) a valid, binding, contract; (2) a protectible interest in the enforcement of the covenant which justifies its enforcement; and (3) reasonable limitations on the scope of the covenant. *E.g., Gorman Publishing Co. v. Stillman*, 516 F.Supp. 98, 104 (N.D.Ill.1981). *See Cockerill v. Wilson*, 51

Ill.2d 179 (1972); *Canfield v. Spear,* 44 Ill.2d 49, 254 N.E.2d 433 (1969); *Morrison Metalweld Process Corp. v. Valent,* 97 Ill.App.3d 373, 376, 52 Ill.Dec. 825, 422 N.E.2d 1034 (1st Dist. 1981). Here, the defendants have challenged Medtronic's non-compete clause on all three grounds.

### 1. *The existence of a valid contract*

All three of the defendants signed employment agreements containing restrictive covenants when they joined Medtronic in 1977 (the "old agreement"), and signed revised agreements containing similar post-termination restrictions late in September of that year. The defendants were all experienced salesmen at the time that they signed those agreements, and they were educated individuals as well. It cannot be said that they either lacked contractual capacity or were unable to comprehend the meaning of the restrictions on competition to which they agreed.

The defendants have argued that the revised agreement should be found void for lack of consideration. The court cannot agree. The revised agreement was supported by two alternatively sufficient bases for consideration. First, Medtronic changed its compensation scheme to the EQRA at the time that the defendants signed the agreement, thereby increasing the salary of each. An increase in pay is certainly sufficient consideration to support a modification of an employment agreement. Although defendant Conde argues that the EQRA was changed in May of 1981, and that therefore, Medtronic's consideration for the revised agreement has been withdrawn, he has failed to demonstrate a return to the quota system which

preceded the EQRA, or that his own level of pay has returned to what it would have been under the old system. A mere revision in Medtronic's compensation scheme, which is all that Conde has demonstrated, does not, in itself, render the revised agreement unenforceable.

In addition to compensation increases, in this case continued employment of the defendants by Medtronic was sufficient consideration to render the revised agreement enforceable. *See Carter v. Kaskaskia Community Action Agency,* 24 Ill.App.3d 1056, 1059, 322 N.E.2d 574 (5th Dist. 1974). Where, as here, employment is at will, and the employees agreed to the restrictions when they began their employment, the court finds that their continued employment is sufficient consideration for a revision in the terms of the restriction. *Id. See Reed, Roberts Associates, Inc. v. Bailenson,* 537 S.W.2d 238, 240, 241 (Mo.App.1976); *Farm Bureau Service Co. v. Kohls,* 203 N.W.2d 209 (Iowa 1972); *Wrentham Co. v. Cann,* 345 Mass. 737, 189 N.E.2d 559 (1963). *But see George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975); *James C. Greene Co. v. Kelley,* 261 N.C. 166, 134 S.E.2d 166 (1964).[4] In this case, each of the defendants signed an agreement which explicitly stated, "In consideration of ... my continued employment, ... I agree as follows ..." The court finds that the agreements were, as the employees agreed at the time, supported by consideration.

The last of the defendants' challenges to the validity of the revised agreement is that the agreement was an adhesion contract, and that the defendants signed the contract under the duress of either signing or losing

---

**4.** The issue of consideration is discussed at length in *Reed, Roberts.* There, the defendant employee challenged the validity of a revised non-competition agreement as lacking sufficient consideration. There, as here, the defendant's employment was at will, and he had signed an original non-competition agreement when he began his employment. The court found that the revised agreement was supported by the consideration of the defendant's continued employment:

"[T]he continuance by the employer of the employment where continuance is not re-

quired supplies adequate consideration for a secondary contract [such as the revised non-competition agreement]....

"Here, we are not considering a contract of employment for a definite term where a party brings about a modification during the term without any consideration. The prior contracts between plaintiff and defendant could be terminated by either party. As found by the trial court, the ... contract upon which the suit was brought was based upon the consideration of continued employment."

their employment. Neither of the arguments is persuasive. True, the Medtronic employment agreements were prepared by Medtronic. That fact alone, however, provides no evidence of the gross disparities in bargaining power which typify most adhesion contracts. *See United States Trotting Association v. Chicago Downs Association,* 487 F.Supp. 1008 (N.D.Ill.1980). The defendants signed the old agreement at a time at which Medtronic needed additional salesmen, and the defendants were seeking employment. Based on the evidence presented, the defendants simply chose to accept Medtronic's terms of employment. There is no evidence that any was coerced to do so. Regarding the revised agreement, there is no evidence that any of the defendants disagreed with its terms when it was presented to them in late September, 1977, or that Medtronic was, at that time, capitalizing upon any disparity in bargaining power. Indeed, there is little if any substantive difference between the non-competition clauses in the two agreements. No evidence was presented to suggest that any of the defendants sought modification of any of the terms of the revised agreement, or that they even questioned the meaning of the new non-competition clause. The defendants' entire argument seems to be predicated upon Medtronic's insistence that continued employment was contingent upon their signing the revised agreement, but in doing so, the defendants mistake consideration for coercion. Courts have consistently enforced revised employment agreements which were conditioned upon continued employment. *See, e.g., Reed, Roberts, supra.* When the terms of employment at will are revised, an employee must decide whether to accept the new terms or seek alternative employment. Continued employment under the old terms may simply not be one of the options available to the employee, and the fact that it is not one of the options available does not make the employee's decision the product of coercion. The court concludes that the defenses of duress and adhesion fail, and that both the old agreements and the revised agreements signed by each of the defendants were valid contracts.

## 2. The existence of a protectible employer interest

Under Illinois law, a post-termination non-competition clause is not enforceable "unless the employer can demonstrate that a 'protectible interest' justifies it ..." *Gorman Publishing Co. v. Stillman,* 516 F.Supp. at 104. Two such protectible interests are generally recognized. First, if the employee "acquired confidential information through his employment and subsequently attempted to use it for his own benefit," courts will allow the employer to protect his interest in that information. *Morrison Metalweld,* 97 Ill.App.3d at 376, 52 Ill.Dec. 825, 422 N.E.2d 1034. Second, courts will allow an employer to protect his interest in its customers if, by the nature of the business, the employer has "a long-standing relationship with its customers, with whom the defendant would not have come in contact" but for his association with the plaintiff. *Id.* See *Cockerill v. Wilson, supra; Canfield v. Spear, supra; Donald McElroy, Inc. v. Delaney,* 72 Ill. App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist. 1979); *Wessel Co. v. Busa,* 28 Ill.App.3d 686, 692, 329 N.E.2d 414 (1st Dist. 1975). *Cf., Nationwide Advertising Service, Inc. v. Kolar,* 14 Ill.App.3d 522, 302 N.E.2d 734 (1st Dist. 1973) (no protectible interest in customers where relationship is merely transitory). Although this case presented a very close question as to the first type of protectible interest, whether the defendants possessed the requisite confidential information to justify enforcement of the agreement, the court finds that Medtronic's long term relationships with its customers bring it within the meaning of the second type of protectible interest, and therefore, the court need not address the confidentiality issue.

Medtronic's close professional relationships with its hospital accounts, prescribing physicians and implanting surgeons predates the defendants' employment with Medtronic. The defendants, none of whom sold pacemakers prior to joining Medtronic, received extensive training from the plaintiff, and were well-compensated by the

plaintiff to further develop close personal and professional relationships with the doctors upon whom they called. The defendants, in developing those relationships "exceeded traditional boundaries of salesman responsibilities." *Wessel Co. v. Busa*, 28 Ill.App.3d at 692, 329 N.E.2d 414. Medtronic's salesmen played an integral role in the entire pacemaker implantation process, from sale through post-implanatation [sic] follow-up. Medtronic salesmen, among other things, attended surgeries and provided continuing technical assistance to the doctors upon whom they called. To further cement the close customer relationships, Medtronic periodically flew physicians to Minnesota to tour its facilities, and also paid the expenses for its salesmen to wine and dine physicians and members of hospital staffs. As such, the relationships are more closely analogous to the near-permanent relationships described in *Morrison Metalweld, Cockerill* and *Canfield*, then they are to the transitory nature of many other unprotectible customer relationships. Therefore, the court finds a protectible interest to exist here which would justify enforcement of the agreement, thus satisfying the second requirement for enforcement.

### 3. *The existence of reasonable limitations on the scope of the covenant*

The final requirement-for [sic] the enforcement of a non-competition agreement is that the agreement be reasonable in scope as to both time and geography. *Briggs v. R. R. Donnelley & Sons, Inc.*, [sic] 589 F.2d 39, 41 (1st Cir. 1978) (applying Illinois law). The non-competition agreement here is reasonable as to both. First, the agreement only restricts the defendants' conduct for 360 days following their resignations from Medtronic. Given the length of time needed to replace an experienced employee and the shortness of the restriction, the court finds the time restraint to be reasonable. *See Cockerill, supra* (5-year restriction upheld); *Canfield, supra* (3-year restriction upheld).

Second, the court finds the geographic restraint contained in the agreement to be reasonable and tailored specifically to the interest which Medtronic seeks to protect. Medtronic's agreement restricts only contacts with those customers with whom each of the individual defendants dealt, and not all of the customers of Medtronic as a whole. Furthermore, the restriction does not foreclose the defendants from selling pacemakers in the Chicago metropolitan area, so long as they do not contact customers with whom they previously dealt. The narrowness of that limit has enabled the defendants to secure territories with Intermedics which do not even require them to relocate from their present residences. The restriction at bar is reasonable as to time and geography and is not unduly burdensome to the defendants. *See Gorman Publishing Co. v. Stillman, [supra]*.

The court concludes, after reviewing the non-competition agreements here, that they are reasonable and should be enforced. The Illinois Appellate Court in *Morrison Metalweld* observed, "[w]hen a party to an employment contract agrees, in exchange for certain benefits, to refrain from competing with his or her employer, that agreement should be enforced where equitable." 97 Ill.App.3d at 376, 52 Ill.Dec. 825, 422 N.E.2d 1034. Here, it seems only equitable that Medtronic should have the right for which it contracted, to replace the defendants in its close doctor-salesman relationships before the defendants have the opportunity to appropriate those relationships for their own private gain.

### B. *Interpretation of the agreement*

Having decided that the restrictive covenant is enforceable, the court is next required to interpret the terms of the agreement. The defendants contend that the use of the word "customer" in the agreement means that they should only be restrained from contacting hospitals, and that they should be left free to contact doctors with whom they dealt as Medtronic employees. According to their argument, hospitals are the ones who actually order the pacemakers, and are therefore the salesmen's cus-

tomers within the common meaning of that term. The court rejects that argument. While it is true that hospitals may be responsible for the actual ordering of pacemakers, the real "customers" in the pacemaker industry are the physicians who prescribe them. In the pacemaker business, the salesman's attentions are usually focused upon the physician, the individual whom the salesman counsels in making certain pacemaker selection decisions, whom the salesman assists in the operating room, and whom the salesman wines and dines. He or she is clearly the salesman's customer.

The defendants have suggested that regardless of the meaning of the word customer in the pacemaker industry, the plaintiff, which drafted the agreement, failed to define the word for the defendants, and therefore, the word should be defined according to its ordinary meaning, and construed against the drafter. The court rejects that argument. At the time that the defendants signed the revised agreements, the court concludes that all of them knew that the term customer included physicians. Second, the court finds that in the context of sales in general, the term "customer" is broad enough to include generally the class of individuals upon whom a salesman calls in effecting his sales, regardless of which of those individuals actually places the order. The defendants were all experienced salesmen when they signed their first employment contracts with Medtronic. Certainly, Medtronic told them upon whom they would be calling for their new employer. The court can only conclude that the defendants understood the restriction on contacts to include physicians. The definition of customer suggested by the defendants is simply too narrow to be accepted.

The sole remaining question of interpretation concerns the following language in the agreement: "I will not *attempt to divert* any Company business *by* soliciting, contacting or communicating . . ." (emphasis added). By its terms, the agreement only prohibits attempts to divert, and not all communication with former customers of the defendants. While it is difficult to

ascribe a precise meaning to the phrase "attempt to divert," the court concludes, based on all of the evidence, that the following conduct constituted impermissible attempts to divert which violated the non-competition agreement:

1. The distribution of Intermedics business cards by Cain in his former Medtronic territory;

2. Sales of Intermedics pacemakers by Benda and Cain to doctors or hospitals whom they had contacted in their last year with Medtronic, regardless of whether the hospitals at which the implantations were performed were located within their former Medtronic territories;

3. Attendance at surgeries in their former territories at which Intermedics pacemakers were implanted by Benda and Cain;

4. Benda's personal introduction of Conde to various individuals with whom Benda dealt in his last year with Medtronic;

5. Cain's arrangement of a product demonstration in his former Medtronic territory;

6. Conde's lunch and dinners with doctors whom he had contacted during his last year with Medtronic violated the non-competition agreement as follows:

   a. Any meals which were paid for by Intermedics are conclusively presumed to have been for the purpose of diverting business, whether in the long term or short term;

   b. Any discussion of the qualifications of either of Conde's co-defendants, who would be serving the doctor or hospital temporarily, constitutes attempts to divert business.

The above list of impermissible attempts to divert business is not exhaustive. While the court will not speculate as to hypothetical cases or prejudge whether or not certain activities might be found to be violative of the agreement, nevertheless, it should be noted that neither subtle nor explicit attempts to divert business are permitted un-

der the agreement. Contact of a former customer, even to sell nonpacemaker products, may be construed as an attempt to divert business where the defendants' new employer sells directly competing pacemakers. Also, contact need not be initiated by one of the defendants in order to constitute an attempt to divert business. An attempt to divert business may consist of merely responding to a physician's request for information or assistance. To protect the public interest, medical emergencies, of course, are excluded from that proscription.

Non-competition agreements such as the one at issue here do not violate the First Amendment rights of the restricted parties, but are designed only to achieve the restriction of certain commercial speech for which the parties themselves had contracted. The court does not hold that the defendants may not communicate. Rather, it holds only that each of the defendants may not attempt to divert business from the plaintiff. Communication, per se, is restricted only insofar as it would violate the non-competition agreement agreed to by the parties.

### C. Claims for additional relief

#### 1. Tortious conduct

In addition to its request for injunctive and declaratory relief on its contract claim, the plaintiff introduced certain evidence at trial which it now claims supports a finding of tortious conduct on the part of the defendants, although no such claim was stated in the complaint. As relief for the alleged tortious conduct, the plaintiff seeks to restrain each of the defendants from contacting his former Medtronic customers for one additional year beyond the 360 days provided for in the non-competition agreement. The plaintiff seeks also to amend its complaint to conform with the evidence presented at trial. The court denies the plaintiff's requests for several reasons.

First, at the time that this court consolidated these cases, and at the time that the defendants conducted discovery and otherwise prepared for trial, these cases were represented to be three virtually identical breach of contract cases. The court finds that the defendants would be unduly prejudiced by any attempt to transform those cases at this time into three very dissimilar tort actions. Second, the additional relief which the plaintiff requests is effectively directed against Intermedics, Inc., which has never been made a party to this action. Any such attempt to punish a non-party to this action seems to the court to be inappropriate, regardless of the interest which the non-party may have in the proceedings. Finally, to the extent that any such tortious conduct could be proven, there has been no attempt made to prove that there has been any injury as a result of the tortious conduct per se, as distinguished from the injury caused by the breach of contract alone. In all, the court finds that the parties did not consent to the trial of Medtronic's tort claims pursuant to Fed.R.Civ.P. 15(b), and that justice requires that the plaintiff's request to amend its complaint pursuant to Fed.R.Civ.P. 15(a) or 15(d) be denied.

#### 2. Restrictions based upon mutual agency

The plaintiff's final request for additional relief suggests that because of the defendants' close relationships among themselves, their rotation of former Medtronic territories to serve as temporary Intermedics territories, and their habit of covering each other's surgeries, each defendant should be enjoined from entering the former Medtronic territory of either of his co-defendants for the remainder of the 360-day non-competition period. The court rejects the plaintiff's argument.

The court recognizes that attempts to circumvent restrictive covenants may, in some cases, justify restraints on non-parties to the covenants. See Arwell Division of Orkin Exterminating Co. v. Kendrick, 131 Ill.App.2d 632, 267 N.E.2d 352 (3d Dist. 1971) (wife held to be bound by husband's non-competition agreement). Nevertheless, the court cannot find that the defendants here were so identified with each other as to be considered each other's agents or alter egos, and will not restrict them from each other's former Medtronic territories. Of course, none of the defendants is free to

reenter his own former territory for the purpose of introducing one of his codefendants to potential customers, and the defendants are not free, under the terms of the non-competition agreement, to impart to each other any confidential information they might possess regarding particular contacts within their former Medtronic territories. Any such contacts or information would represent an impermissible attempt to appropriate Medtronic's protectible customer relationships discussed above. *See Donald McElroy, Inc. v. Delaney,* 72 Ill. App.3d at 291–2, 27 Ill.Dec. 892, 389 N.E.2d 1300.

### III. *Conclusion*

For all of the reasons stated above, the court concludes that clause 5(b) of the revised employment agreements entered into between Medtronic and each of the three defendants is valid and enforceable for 360 days following each defendant's resignation from Medtronic. The agreement is enforceable against Benda until August 25, 1982, against Conde until August 27, 1982, and against Cain until August 29, 1982. Until such time as the agreement is no longer enforceable against him, each defendant is ORDERED not to attempt to divert any Medtronic business by soliciting, contacting or communicating with any customers for Medtronic products, including physicians, with whom he, or employees under his control, had contact during the year preceding his resignation from Medtronic. The defendants are particularly ORDERED not to engage in any further conduct or practices in contacting and dealing with their former Medtronic customers as described at pages 654 and 655 of this opinion and found to be in violation of the agreement.

The above findings of fact and conclusions of law represent a final resolution of Medtronic's claim for injunctive and declaratory relief against the three defendants. Those findings and conclusions are entered without prejudice to any additional right of Medtronic to petition the court for appropriate relief and sanctions, including possible contempt citations, against any of the defendants for violations of the non-competition agreement committed during the pendency of any restraining order or temporary injunction of this court, or breach of any additional agreement or representation by the parties that they would not violate section 5(b) during the course of this litigation.

ENTER: BERNARD M. DECKER
United States District Judge

DATED: February 4, 1982.

### APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| MEDTRONIC, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| –vs– | ) | No. 81 C 5029 |
| | ) | (Consolidated) |
| CHARLES F. BENDA, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Medtronic, Inc., brought civil actions for declaratory and injunctive relief against three of its former employees, Charles F. Benda, Emil Conde and William C. Cain, to enforce the terms of noncompetition agreements which were allegedly in effect at the time that the three resigned from Medtronic's employ in August and September, 1981. The three cases were originally consolidated for discovery purposes, and have since been consolidated by the court for all purposes, including trial. Before the court are defendants Benda and Conde's jury demands as to Medtronic's claim.[1]

Rule 57 of the Federal Rules of Civil Procedure provides that in actions for declaratory judgment pursuant to Title 28, U.S.C. § 2201, "the right to trial by jury may be demanded under the circumstances

---

1. Defendant Benda, in addition to answering Medtronic's complaint, has filed a counterclaim, and a jury demand as to the counterclaim. This will be discussed separately, later in the court's opinion.

and in the manner provided in Rules 38 and 39 [of the Federal Rules of Civil Procedure.]" Although Benda and Conde have filed timely jury demands, Fed.R.Civ.P. 38(b), the court on its own motion strikes those demands pursuant to Rule 39(a):

"When trial by jury has been demanded as provided in Rule 38, . . . [t]he trial of all issues so demanded shall be by jury unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States."

The court's decision to strike the demand is compelled by its conclusion that this is an action wholly for equitable relief, and therefore no right to a jury trial exists.

The Seventh Amendment to the United States Constitution provides that in "[s]uits at common law, where the value of the controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." Of particular relevance here are the words "suits at common law." It is generally recognized that if a case "is a purely equitable one," it is not considered a suit at common law, and "the parties are not entitled to a jury." *Owens-Illinois, Inc. v. Lake Shore Land Co., Inc.*, 610 F.2d 1185, 1189 (3d Cir. 1979) (court held no right to jury trial in action for declaratory relief and specific performance of option clause in commercial lease, where plaintiff sought only equitable relief and no damages). *See Ross v. Bernhard*, 396 U.S. 531, 537–38, 90 S.Ct. 733, 737–38, 24 L.Ed.2d 729 (1970); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). The sole issue here in determining the defendants' right to a jury trial on Medtronic's claim, then, is whether that claim is wholly an equitable one.

Unlike typical breach of contract actions, this suit is, in essence, an action to declare the continuing validity of a contract, specifically the noncompetition clause in an employment contract. The plaintiff here does not seek damages for breach, but only requests that the court enjoin the defendants from breaching that term. The relief requested is, in essence, specific performance of a restrictive covenant. Such a claim is not a suit at common law. As the Third Circuit noted:

"An action for specific performance, without a claim for damages is purely equitable and historically has always been tried to the court. *See Klein v. Shell Oil Co.*, 386 F.2d 659 (8th Cir. 1967); 5 Moore's Federal Practice ¶ 3821 (2d ed. 1979); 9 C. Wright & A. Miller, [Federal Practice and Procedure, Civil,] *supra* § 2309."

*Owens-Illinois*, 610 F.2d at 1189. *See United States v. Snepp*, 456 F.Supp. 176 (E.D. Va.1978), *aff'd*, 595 F.2d 926 (4th Cir. 1979), *rev'd on other grounds*, 444 U.S. 507, 100 S.Ct. 1668, 62 L.Ed.2d 704 (1980), (jury demand denied in suit for specific performance of employment termination agreement as to plaintiff's claim for injunctive relief).

Defendant Conde has argued that his answer, in which he pleads such defenses as lack of consideration, prior breach by Medtronic, and misrepresentation, raises legal issues, and that he is thereby entitled to a jury trial. Similarly, defendant Benda has asserted defenses of lack of consideration and the unreasonableness of Medtronic's restraint. The court rejects the argument. While the defenses may raise factual issues, they fail to convert Medtronic's action into a legal one. As the Third Circuit pointed out in *Owens-Illinois*, "issues of fact arise in both legal and equitable proceedings," and the existence of factual defenses in an equitable proceeding does not require a jury. 610 F.2d at 1190. The defendant there had argued that the contract he was sued on was unenforceable because of failure of consideration and the plaintiff's prior breach of the contract. The court rejected the defenses as a basis for a jury trial right:

"To prevail, the plaintiff must establish a valid contract, and the trial will require proof of disputed factual matters and favorable interpretation of law. That, however, does not make plaintiff's claim a 'legal one,' nor do the defendant's denial of facts and assertion of contrary construction of contract language amount to 'legal claims.' "

610 F.2d at 1190. The court here finds *Owens-Illinois* persuasive, and therefore denies the jury demands as to Medtronic's claim.

### The Benda Counterclaim

Subsequent to this court's consolidation of these three cases, first for purposes of discovery, and then for all purposes, defendant Benda filed a counterclaim alleging that (1) Medtronic wrongfully obtained a temporary restraining order to enforce the noncompetition agreement; (2) Medtronic committed an unlawful restraint of trade by consistently enforcing the noncompetition agreement and otherwise restricting its salesmen; and (3) Medtronic, by certain business practices unrelated to the noncompetition agreement, has breached its agreement with Benda and otherwise injured him. This counterclaim was timely filed, although it should be noted that it was filed subsequent to the court's decision to consolidate the three cases for trial, and also subsequent to the dismissal of Medtronic's claim against Benda (and the later reinstatement of that claim when the parties were apparently unable to effectuate an acceptable settlement agreement). Neither of the other two defendants has filed a counterclaim. The plaintiff has alleged that none of the counts of the counterclaim state a claim upon which relief can be granted.

Since neither of the other two defendants in this matter has filed a counterclaim, and since a number of the issues raised by Benda's claim are based on facts and circumstances unique to the relationship between Medtronic and Benda,[2] the court finds that severance of Benda's claim from that of Medtronic is appropriate. This especially is true where, as here, the plaintiff has alleged that the defendant has failed to state a claim upon which relief can be granted. Such a severance will be conducive to expedition and economy. Fed.R.Civ.P. 42(b). As the counterclaim will be tried separate-

ly, if it is sustained, Benda's jury demand as to its [sic] counterclaim need not be addressed at this time.

For all of the above reasons, the demand by Conde and Benda to a jury trial of Medtronic's claim for declaratory and injunctive relief is denied.

<div align="right">

ENTER: BERNARD M. DECKER
United States District Judge

</div>

DATED: November 9, 1981.

</div>

---

**2.** From what the court can determine, Benda is claiming that Medtronic forced him to create a pacemaker market where none was needed. This is the basis for his "prior breach" counter-claim, and also a partial basis for his "restraint of trade" counterclaim. Apparently, these facts are unique to Medtronic's relationship with Benda.