GREAT CENTRAL INSURANCE COMPANY, Plaintiff-Appellant, v. ROBERT E. BENNETT et al., Defendants-Appellees.—(ROBERT E. BENNETT, Third-Party Plaintiff, v. CONTINENTAL CASUALTY COMPANY, Third-Party Defendant.)

Second District (2nd Division)   No. 75-1

Opinion filed July 21, 1976.

RECHENMACHER, J., dissenting.

Collins, Stepanich & Collins, of Waukegan, for appellant.

Snyder, Clarke, Dalziel, Holmquist & Johnson and David A. Decker, both of Waukegan, and Inglis, LaBelle & Sparks, of Zion, for appellees.

Mr. JUSTICE DIXON delivered the opinion of the court:

The plaintiff in this case, Great Central Insurance Company, filed a complaint for a declaratory judgment against the defendants, Robert E. Bennett, Richard Cackovic, and Charlotte Davis. In its complaint, Great Central asked the court to find that there was no coverage under an insurance policy it had issued to Bennett, for either Bennett or Cackovic, with respect to a claim arising out of an accident of Davis. Bennett and Cackovic in their answers asked the court to construe Great Central's policy to give both of them coverage. Bennett subsequently filed a counterclaim against Great Central, asking that Great Central be required to issue a policy conforming to the agreement made by its agent with Bennett, or be held liable to pay the $25,000 judgment Davis had meanwhile obtained. Bennett also filed a third-party complaint against Continental Casualty Company, which had issued a policy to Cackovic, seeking a determination that Bennett as well as Cackovic was covered by Continental Casualty's policy. Following a bench trial, the Circuit Court of Lake County, Illinois, found that Great Central's policy afforded coverage to both Bennett and Cackovic with respect to the claim of Davis, and that Continental Casualty's policy did not cover Bennett as an insured. Its order required that Great Central indemnify Bennett and Cackovic in accordance with the policy it had issued, and held that Continental Casualty had no obligation to Bennett. Great Central has appealed.

It appears that Bennett is the operator of a service station and an adjoining car wash at 901 Sheridan Road, in Winthrop Harbor, Illinois. Cackovic is the owner of the real estate where the two businesses are conducted. The premises extend a distance of 200 feet north and south on Sheridan Road and run east approximately 140 to 150 feet to an alley. When Cackovic purchased the north 100 feet in 1963, there was a service station on the property. Within a year he purchased another 100 feet of property south of and adjoining the site of the service station, and there, in 1967, he constructed a three-stall car wash.

The north wall of the car wash building was 40 feet south of the south wall of the service station building. Behind the service station building, to the east, there were two coin-operated vacuum cleaners. The car wash

building consisted of three stalls, one automatic and two do-it-yourself stalls. South of the entrance to the car wash building, on a pylon on the south line of the premises, was a large round sign which said "United," to announce the proximity of a United Oil Products service station, and below the round sign was another which said "car wash." The southernmost do-it-yourself stall in the car wash building was where Davis fell and was injured, on March 9, 1972, causing questions to arise as to what premises and what persons were covered by the insurance policies which Bennett and Cackovic had purchased.

Cackovic operated the service station and car wash in Winthrop Harbor with employees of his own, prior to August 1, 1968. He was also a jobber, and supplied a number of stations he owned or leased with petroleum products. Bennett worked for him as a supervisor at the Winthrop Harbor service station and car wash, and was paid a weekly salary. Cackovic decided that instead of continuing to operate that station and the car wash he would put in a dealer, so he asked Bennett if he wanted to go into business for himself at that location. Bennett agreed to do so, and to take over on August 1, 1968.

The agreement the two of them made was that Bennett would operate the premises with his own employees, as a dealer; would purchase the station's inventory of automotive products and other merchandise for $13,000; would receive gasoline from Cackovic on consignment, sell it at the price set by Cackovic, and retain five cents for each gallon sold; would make weekly reports on receipts from car washes, for which the price would be set by Cackovic, and retain ten percent of gross receipts from the car wash business; and would maintain the premises and take care of the equipment. Cackovic, under their agreement, was to supply the gasoline, offer oil and other automotive products for sale to Bennett at wholesale prices and pay for electricity, water, soap, wax, and repairs for the entire premises.

Cackovic knew Percy J. Moran, an insurance agent. At that time he had known Moran about 25 years. Moran had been an agent for Great Central for 14 years. He wrote insurance exclusively for Great Central, could write all of Great Central's lines of insurance, and could bind coverage without prior authorization from Great Central. Cackovic had done business with Moran and knew that his company specialized in small business deals and collected premiums monthly. Cackovic therefore called Moran, according to the testimony given by Cackovic at the trial of this case, and arranged for a meeting of Moran, Cackovic, and Bennett to discuss Bennett's insurance needs.

A meeting with Moran was held shortly before August 1, 1968. Cackovic testified that the meeting was held at his office, which was located at the intersection of State Line Road and Green Bay Road in

Zion, Illinois; that he, Moran, and Bennett were present; that he explained what the arrangement was, that Bennett was going to sell gasoline for five cents a gallon, have ten percent of the gross from the car wash, and have all of the profits from the sale of the other products; and that he said to Moran that Bennett needed workmen's compensation insurance, liability insurance, and fire insurance "on the operation."

Bennett testified, similarly, that the meeting to discuss his insurance needs took place in Cackovic's office; that the three of them were present; that Cackovic explained to Moran what the financial arrangement was for gasoline, car washes, and merchandise; that Bennett told Moran he would have five employees who would be pumping gas, selling merchandise, and cleaning and operating the car wash; that he told Moran to "cover the whole thing"; and that by "the whole thing" he meant all the property he operated, including both the car wash and the station.

Moran testified that he had known Cackovic and Bennett for some time; that he believed he canvassed Bennett for insurance because he knew Cackovic was leasing out his other stations rather than operating them himself; that the conference on insurance took place on August 1, 1968, at the service station, and only he and Bennett were present; and that he knew Cackovic owned the entire premises, but Bennett asked him to insure only the service station, and the service station was all they discussed. In the course of the meeting on insurance, Moran filled out an insurance application form for Bennett to sign. He doubted that Bennett read it before signing it. At that time he also collected the first month's premium, which was based on employees' salaries. Later he delivered the policy to Bennett. Afterwards he went back to the station a number of times to collect monthly premiums. Once Bennett gave Moran a free car wash, Bennett recalled. But Moran did not remember that Bennett ever said anything to him with regard to the car wash.

The policy which Moran delivered to Bennett was a 17-page policy for multi-use application entitled "General—Automobile Liability Policy," consisting of three parts, with attached endorsements, one of them being a garage insurance coverage part. Bennett read most of the policy when he received it. Great Central sent him a new policy each succeeding year, but he did not read any which came after the initial one. The policy did not specifically refer to a car wash. Bennett said: "It doesn't say anything about a car wash or not a car wash." Moran testified that a policy for a car wash would have been not a garage liability policy based on payroll, but an owner's landlord liability policy based on income from the car wash operation, and he would have earned more money by writing an owner's landlord liability policy in addition to the garage liability policy.

The policy provided that Bennett was the named insured, and his

business was service station operator. It defined "garage" to include a service station. It defined "garage operations" to mean the ownership, maintenance, or use of premises for the purposes of a garage and "all operations necessary or incidental thereto." It stated that "premises" means premises where the named insured conducted garage operations, but not any portion of such premises "upon which business operations are conducted by any other person or organization." It protected the named insured and also "any person or organization having a financial interest in the garage operations of the named insured." It stated, however: "This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured."

Cackovic had a general liability policy with Continental Casualty, a commercial casualty policy covering all his real estate, including the station and the car wash in Winthrop Harbor. Persons insured under the Continental Casualty policy included "any person other than an employee of the named insured or organization while acting as a real estate manager for the named insured." "Real estate manager" was not defined in the policy. The trial court held that Bennett was not a real estate manager of the Winthrop Harbor property but was engaged in his own business operation there as a lessee, and was therefore not covered by Cackovic's policy. It appears that the contention is no longer made, in this court, that the Continental Casualty policy covers both Cackovic and Bennett. Before the accident of Davis, Bennett sent a few minor car wash claims to Cackovic, or to Cackovic's insurance agency, for payment by Continental Casualty. But when he received a notice of attorney's lien, following the Davis accident, Bennett promptly got in touch with Moran, his own insurance agent.

After receiving the notice of lien, Bennett testified, he phoned Moran that night and asked whether he were covered all right, and Moran said to him, "I believe you are." Moran testified, however, that there was no discussion of where the accident happened, how it happened, or whether Bennett was covered; that Bennett called and told him he had received an attorney's lien notice, and he simply told Bennett to send it to him and he would send it on to the home office.

The next time Bennett heard of the Davis claim was when he was served with a summons and a copy of a complaint. He called Moran again and reported receiving them, and Moran said to send the papers to him right away, Bennett testified. Bennett also asked Moran what had happened to the lien notice and Moran said he forgot it or didn't remember it, Bennett stated. Moran had no recollection of this

conversation, at the time of the trial. Moran admitted at the trial that after receiving the lien notice he had misplaced it somehow and did not send it to the home office until some time later.

After being notified of the accident by Moran, Great Central hired Warren Frei, an independent adjuster, to investigate the Davis claim. Frei took statements, examined the premises, took photos, and made a diagram of the entire premises. He wrote a report, in the course of his employment by Great Central, in which he described the insured premises as consisting of a gas station and a car wash; stated that the insured, Bennett, had been complete manager of the car wash and manager of the gas station since August 1968; explained that Bennett sent minor claims to Cackovic's insurance agency because he had been directed by Cackovic to do so, but reported the Davis claim to his own insurance agent, Moran, because he himself was named as a defendant in the notice of attorney's lien; and mentioned Bennett's talking a second time with Moran and thinking Moran's forgetting about the lien was strange at the time.

Part of Frei's assignment was to take a statement from Moran. The report written by Frei stated that he had tried to obtain a statement from Moran but had not been able to do so, and that he would continue in his attempts and was hopeful that Moran would be more cooperative. At the trial Frei testified that he had written to Moran; that he had called him about taking a statement, and Moran had acknowledged receipt of the letter; and that he was not certain that Moran had actually refused to give him a statement, but they never could get together, they just couldn't work it into their schedules. At Frei's discovery deposition he stated that he had written to Moran and had talked to Moran on the phone, and that Moran had refused to meet him. Moran testified at the trial that he did not recall ever having talked to Frei before that day, and that he had never received any correspondence from Frei.

The trial court found that all three persons, Cackovic, Bennett, and Moran, were present at the conference on insurance; that Moran understood that Bennett was taking over the car wash and the service station businesses; that Bennett was to be no longer Cackovic's employee but his tenant under a percentage lease, and Moran was aware of the situation; that Moran knew that Bennett wanted insurance for both of the businesses he would be running at the Winthrop Harbor location; that Bennett thought he was being fully covered; and that Moran collected premiums from Bennett based on the salaries of employees who were being used in the operation of both the car wash and the service station. The trial court's findings should not be disturbed unless they are manifestly against the weight of the evidence. (*Brown v. Zimmerman*, 18 Ill. 2d 94, 102.) From our review of the testimony we cannot conclude that

the trial court erred in considering Moran's recollection of events to be less reliable than the recollection of the other witnesses, and cannot hold that the trial court's findings are manifestly against the weight of the evidence.

It is admitted that Moran was an agent of Great Central, and his actions and knowledge were imputable to it. Great Central argues, however, that the language of the policy it issued is not ambiguous; that the policy does not mention car wash; and that in the absence of some ambiguity, the coverage of its policy cannot be extended by parol evidence to include the car wash. Bennett, Cackovic, and Davis, on the other hand, take the position that Great Central's policy is ambiguous; that it covers use of the premises for the purpose of a garage and such other operations as may be considered "necessary or incidental thereto"; and that Bennett's operation of the car wash was incidental to his operation of the garage, as defined to include service station by the policy. The Illinois Supreme Court has pointed out: "An insurance policy is not to be interpreted in a factual vacuum; it is issued under given factual circumstances. What at first blush might appear unambiguous in the insurance contract might not be such in the particular factual setting in which the contract was issued." (*Glidden v. Farmers Automobile Insurance Association*, 57 Ill. 2d 330, 336.) In deciding whether an ambiguity exists, therefore, the factual setting for a policy's issuance must be considered. (*Goetze v. Franklin Life Insurance Co.*, 26 Ill. App. 3d 104, 108.) A latent ambiguity will not otherwise be discovered. (See *General Casualty Co. v. Elam*, 8 Ill. App. 3d 215, 219-20.) In the case before us, whether use of the expression "incidental" created an ambiguity in Great Central's policy requires considering extrinsic proof of the situation to which the policy was to have application; and this discloses that whether the language of the policy was to cover just one business, or whether it was also to cover, as an "incidental" operation, another related business which was conducted in a separate building on the same premises by the same person with his same employees, is an ambiguity needing to be resolved.

■■■ There being an ambiguity in the policy, we may look to well-established rules for its interpretation or construction. Where the language of an insurance contract is ambiguous, a court to ascertain intent may consider the subject matter of the contract, the facts and circumstances attending its execution, the situation of the parties, and the predominant purpose of the contract which ordinarily is to provide indemnity. (*Brady v. Highway Commissioner*, 24 Ill. App. 3d 972, 975-76.) In case of ambiguity a reasonable construction of the language which affords coverage should be adopted. (*Olipra v. Zambelli*, 1 Ill. App. 3d 607, 610.) Since the insurer has drafted the policy, if any possible ambiguity exists it should be construed against the insurer. (*Manchester Insurance &*

*Indemnity Co. v. Universal Underwriters Insurance Co.*, 5 Ill. App. 3d 847, 855.) The language of a liability policy should be construed to give the insured the protection which he reasonably has a right to expect. (13 Appleman, Insurance Law and Practice §7486, at 626 (1976).) Accordingly we believe Great Central's policy must be interpreted to apply to both the service station and the car wash, in view of Bennett's evident need, his request for coverage of "the whole thing," his expectation, Moran's apparent understanding, and Great Central's receipt of premiums based on salaries of employees used in both operations. Furthermore, the trial court having found from the evidence that there was a landlord-tenant relationship between Cackovic and Bennett with respect to the two businesses, rather than a partnership or a joint venture, we believe that Cackovic as well as Bennett must be considered to be a person insured under Great Central's policy, by reason of Cackovic's having a financial interest as landlord in the businesses being conducted by Bennett.

For the reasons stated, the judgment of the Circuit Court of Lake County is affirmed.

Affirmed.

T. J. MORAN, P. J., concurs.

Mr. JUSTICE RECHENMACHER, dissenting:

I disagree. While the evidence differed as to what coverage was to be written, a study of the transcripts and the exhibits leads me to the conclusion that the only request made was for coverage on the service station. The application describes the business as a "gas station" and there does not appear to be anything to indicate that insurance was requested or intended for the car wash facility. From the evidence it appears that the car wash facility was owned by Cackovic and insured by him with the Continental Casualty Company and that Bennett simply supervised it.

Although Bennett testified that "he wanted the whole thing covered" he also testified, "I didn't specifically say anything about the car wash." He also testified, "I asked whether the car wash was covered after the claim in 1972. I don't think I ever went out and asked Mr. Moran before Mrs. Davis' accident whether the car wash was covered." Here the policy is a standard form and simply does not cover the operation of a car wash. Moreover, previous claims against the car wash had been presented to Cackovic's agent (Continental Casualty) not to Bennett's agent (Great Central). It was the Davis claim on which Bennett received the notice of attorney's lien which activated Bennett to make claim against Great Central. Previously, it appears from the evidence, the car wash had been

considered by both Bennett and Cackovic as Continental Casualty's liability. It was, therefore, not a case of an oversight—it was possible that neither Bennett nor Cackovic nor the agent, Moran, considered that Bennett had an exposure in connection with the car wash. In my opinion the judge's holding was incorrect.

This case does not involve a question of waiver of a condition, but rather a condition of extending the coverage to cover the car wash. As I understand the judge's remarks in rendering judgment he did not base his decision on an interpretation of the policy as actually written, but rather on the coverage the agent *should* have provided in the light of the facts divulged to him by the insured and the owner, Cackovic. Since the agent knew there was already a liability policy in Cackovic's name covering the car wash and knew that Cackovic owned the car wash building and the business, I do not think the failure of the agent to make a further inquiry as to whether Bennett should not also have his own policy as supervisor of the car wash was such negligence on the agent's part as to create a new coverage which the company did not intend to write at the time it issued its policy and thus make the company liable.

In this connection see Annot., 1 A. L. R. 3d 1139, 1148-50 (1965)—the case of *Jennings v. Bituminous Casualty Corp.*, 47 Ill. App. 2d 243; also, *Commonwealth Insurance Co. v. O. Henry Tent & Awning Co.* (7th Cir. 1961), 287 F.2d 316, *cert. denied*, 386 U.S. 826, 7 L. Ed. 2d 30, 82 S. Ct. 45, (applying Illinois law); also, *Spence v. Washington National Insurance Co.*, 320 Ill. App. 149; in addition, the Wisconsin cases of *Rosenthal v. Insurance Co. of North America* (1914), 158 Wis. 550, 149 N.W. 155, and *Summers v. Oakfield Town Mutual Fire Insurance Co.* (1944), 245 Wis. 40, 13 N.W. 2d 518.

The "ambiguity" referred to by the majority is, in my opinion, farfetched. The operation of a car wash facility is not necessary or incidental to the operation of a service station merely because they are on the same premises and owned by the same person. They are separate and independent of each other and neither has anything to do with the necessary *operation* of the other. They are associated merely because it is economically attractive to operate the two businesses on the same premises. The two operations are *associated with* but not *incidental to* each other. Many, if not most, service stations do not operate a car wash facility.

Actually, the argument is that the presence of the car wash facility created an ambiguity as to what coverage the insured intended. This "ambiguity" is derived from the trial court's opinion that there was a "need" for such coverage and the insured is deemed to have intended to buy whatever coverage he needed for full protection. But, the insured's need for the coverage cannot create an ambiguity as to what the contract was intended to provide.

The insured got the coverage he applied for on the application, and the argument as to whether or not Bennett needed coverage on the car wash operation as well as Cackovic needing coverage, should not operate to create coverage because of the agent's failure to insist on coverage Bennett did not think he needed or wanted at the time the policy was issued.

I would reverse the trial court.