FSC PAPER CORPORATION, a
Delaware corporation,
Plaintiff-Appellant,

v.

SUN INSURANCE COMPANY OF NEW
YORK, a New York corporation,
Defendant-Appellee.

No. 83–2652.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1984.

Decided Sept. 25, 1984.

As Amended on Denial of Rehearing and
Rehearing En Banc Dec. 5, 1984.

Robert A. Downing, Sidley & Austin, Chicago, Ill., for plaintiff-appellant.

Holland C. Capper, Chicago, Ill., for defendant-appellee.

Before WOOD, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

This diversity case requires us to construe an insurance contract under Illinois law. FSC Paper Corporation ("FSC") sustained an insured fire loss of 12,827 tons of waste newspaper known as "Special Pack." Sun Insurance Company of New York ("Sun Insurance") admitted that it insured against the loss and that it was liable to FSC for the "replacement cost [of the burned Special Pack] at time and place of loss." Brief for Appellee at 2. The parties disagree, however, on the appropriate method of computing the replacement cost. Because we find the method of computation of the loss chosen by the district court to be erroneous, the judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

I.

The facts material to this appeal can be stated briefly. FSC's warehouse, in which it stored an inventory of approximately 30,-000 tons of waste newspaper, caught fire in July, 1979. The fire burned for a week and destroyed 12,827 tons of the 30,000 tons of Special Pack stored in the warehouse.

The dispute over the appropriate measure of damages in the case before us centers around the meaning of certain clauses of the insurance contract. Originally, FSC's contract with Sun Insurance provided that FSC was entitled to the "actual cash value" of the paper lost in a fire. Section 11 of the policy further required FSC to report to Sun "the total values of all property at risk under this policy." These reports were to be made quarterly, within 60 days of the end of the quarter. Endorsement No. 11 to the policy, however, changed the measure of loss in the policy to replacement cost. That endorsement provided in full:

It is understood and agreed that Section 7 of this policy is hereby deleted and replaced by the following:

7. VALUATION: In case of loss the basis of adjustment for all property covered by this policy, except personal property employees [sic], shall be replacement cost at time and place of loss. Personal property of employees shall be on the basis of actual cash value at time of loss.

When rendering reports as provided in Section 11, values are to be reported on an equivalent basis.

Despite this amendment to the insurance policy, FSC continued to base its reports of the value of the paper in the warehouse on the historical cost of the paper in the warehouse. For example, on July 20, 1979, FSC reported the value of the waste paper stored in the warehouse on June 30, 1979, as $45.04 per ton. The fire occurred eight days later and on August 10, 1979, FSC amended the previously made valuation for the second quarter of 1979 upward to

$47.69 per ton. The district court held that, although Sun Insurance did not establish the actual cost of replacing the 12,827 tons at the time of the fire, FSC's recovery was limited to the amount it had reported as at risk under the policy, $47.69 per ton.

FSC argues that this interpretation of the policy was erroneous. It claims that nothing in the policy limits its recovery to the amount reported and that, as the district court acknowledged, it was impossible to predict with any certainty what the actual replacement cost in the event of a loss would be. It further argues that the policy requirement of reporting on an "equivalent basis" meant that FSC would continue its earlier method of reporting based on historical cost because historical cost is the best *predictor* of what replacement cost would be. We agree with FSC's argument that the policy, especially in light of the change from "actual cash value" to "replacement cost" coverage, unambiguously provides for a measure of damages different than historical cost.[1] Our view, which is illuminated below, is that FSC is entitled to a forward-looking remedy designed to make it whole and that it is entitled, if certain conditions are met, to the cost of replacing its inventory.

## II.

It is obvious from the district court's opinion that it considered the case carefully and that it weighed all of the evidence and arguments. The district court was particularly troubled by several factors. Judge McMillen recognized that the market for Special Pack was volatile. He found that the "cost of Special Pack varies daily and sometimes widely." The district court also found that after the fire there was a shortage of Special Pack in the Chicago area and that any efforts to replace the lost Special Pack immediately after the fire would have driven the price up. The district court found that Illinois law favors a "reasonable

and businesslike interpretation" of the terms of the policy and that this principle precluded an interpretation under which "the defendant insurance company would have no way of intelligently underwriting the cost of a prospective loss[.]" The district court was apparently concerned that Sun Insurance would have no way of setting a reasonable premium since it would have no way of knowing what value to place on the property at risk. In light of these concerns, the district court held that "replacement cost," as used in the policy, limited FSC's recovery to the amount it reported on August 10.

While we understand the district court's concern for Sun Insurance's problem, we are compelled to conclude that FSC's recovery is not limited to the amount it reported on August 10, 1979. Our primary reason for disagreeing with the district court's interpretation of the contract is that nothing in the policy explicitly made the linkage between reported value and replacement cost. The Illinois courts have long emphasized that normal rules of contract construction apply to insurance contracts and that courts should not add terms to the policy. *See Pioneer Life Ins. Co. v. Alliance Life Ins. Co.*, 374 Ill. 576, 30 N.E.2d 66 (1940); *Boyle v. Inter Ins. Exchange of Chicago Motor Club*, 335 Ill. App. 386, 82 N.E.2d 179 (1948); *Cook v. Suburban Casualty Co.*, 54 Ill.App.2d 190, 203 N.E.2d 748 (1964); *Schewe v. Home Ins. Co.*, 80 Ill.App.3d 829, 36 Ill.Dec. 81, 400 N.E.2d 501 (1980). We recognized this principle when we held that "courts may not rewrite for the parties insurance contracts which are clear and unambiguous." *Hawkeye-Security Ins. Co. v. Myers*, 210 F.2d 890, 893 (7th Cir.1954). Therefore, because the parties did not provide in their contract that replacement cost was limited by the reported value, we are not free to add such a term.[2] Replacement cost is the

---

1. Sun Insurance argues that "replacement cost" means the same thing as "actual cash value." Aside from the difficulties presented for this view by the different meanings these words ordinarily have, we point out that the policy was changed, by Endorsement 11, from "actual cash value" coverage to "replacement cost" coverage. Therefore, under Sun Insurance's argument, Endorsement 11 would be rendered meaningless. We cannot believe that the parties rewrote the valuation clause for no apparent reason.

    Both parties have argued that the policy is unambiguous. We agree, and therefore we find

it unnecessary, and even inappropriate, to address the dissent's contention that our review of this case is not governed by traditional concepts of contract construction but is instead constrained by the clearly erroneous test.

2. The dissent follows the district court in refusing to give "replacement cost" its plain meaning: the actual cost of *replacing* the property destroyed when the loss occurs. This could be more or less than the reported value (based on book cost) of the property acquired during the preceding quarter. Since here the actual cost of

agreed-upon standard of valuation and, as a forward-looking measure, is basically different from historical cost,[3] which, of course, looks to the past.

■ Even if Endorsement 11 were ambiguous and susceptible of the interpretation Sun Insurance would give it—that the reference to "equivalent basis" limited replacement cost to the stated value—we would construe the ambiguity in favor of the insured. We note that both parties have argued that the policy is unambiguous but they have also disagreed on the policy's meaning. The rule in Illinois is that the terms of an insurance contract, if ambiguous, are to be construed in favor of the insured. *Kirk v. Financial Security Life Ins. Co.*, 75 Ill.2d 367, 371, 27 Ill.Dec. 332, 389 N.E.2d 144, 145 (1978). *See also Simmons Refining Co. v. Royal-Globe Ins. Co.*, 543 F.2d 1195, 1197 (7th Cir.1976). Thus, if we found the policy ambiguous with respect to whether recovery was limited by the reported value, we would be inclined to resolve the ambiguity in FSC's favor and hold that recovery was not so limited. We reiterate, however, that the policy is unambiguous in its provision for

recovery at "replacement cost at time and place of loss."

■ In fact, it would be an unnatural use of the words "replacement cost" to limit recovery for "replacement cost" on the basis of reports of the value, based on incurred costs, of the Special Pack. The valuation reports required under Section 11 were to be based on the value at the end of the reporting quarter. The policy provided for recovery of replacement cost at the time and place of loss, not for recovery of the replacement cost as calculated at the end of the previous reporting quarter. It would be impossible to ensure the accuracy and reliability of a report of cost until the time replacement would actually need to be undertaken—or perhaps until the time it were actually undertaken. Under the reporting method specified in the contract, the values as reported would never be completely up to date for replacement purposes. The replacement cost reported by FSC on June 30, given a volatile market, might not accurately reflect replacement cost a month, or even a week, later.[4] We do not believe that the parties, when they provided for replacement cost coverage, envisioned a situation in which market fluctu-

---

replacement turns out to be higher than the value at which recently acquired inventory was booked, the dissent speaks of "report[ing] an inventory at a low value ... for premium purposes" and "claim[ing] recovery for loss at a higher value." That was the value relationship which pertained here, but it could just as easily have been the reverse.

The dissent also says that the term "equivalent basis" is "undefined, indefinite and obscure in meaning...." Surely such infirm terminology in an insurance contract should, in accordance with all the traditional canons, be construed strictly against the insurer. There is no basis in either precedent or policy for construing such murky language as—of all things—a limitation of liability.

3. In its petition for rehearing Sun Insurance has questioned our use of the term "historical cost." We use "historical cost," perhaps loosely but in any event in a broad sense, to include any sort of backward-looking valuation, even though adjusted, based on costs actually incurred. We are aware that the value reported at the end of each quarter is not necessarily the same as the amount actually paid by FSC for the Special Pack on hand at the end of that quarter. Instead FSC took the total amount of inventory on hand at that time in tons, and apparently multiplied that number by the average price for which newsprint was purchased during the last month of the quarter in question. Thus, for

reporting purposes, the total inventory on hand was revalued at prices which may have been only slightly lagged from "current" prices. Nonetheless, they were prices which had been paid in the *past*. Although the reported value could thus vary from the amounts actually paid over a longer period of time and entered in the books, the reported value is based on prices paid for Special Pack in the past—even though it may be the very recent past. In any event, although reported value thus seems to track the rise and fall of the cost of newsprint in the very recent past, it is not *per se* the same as what replacement of the goods will cost in even the immediate future. For "replacement" looks to the future; it is a measure of what it will take to restore the insured to its position at the time of the loss. It seems to us that, while value in the immediate future may be nearly, or in some cases exactly, equal to value in the very recent past, the concept of replacement cost or value is essentially different from the concept of any past (or—using roughly equivalent terms—"historical" or "book" or "accounting" or "original" or "embedded") cost or value, no matter how recently computed or adjusted.

4. At oral argument, it was suggested by Sun Insurance that FSC should have reported any changes in valuation that occurred during the quarter. We are unable, however, to identify any clause in the policy that purports to require such updated reporting.

ations, in an admittedly volatile market, could be adjusted only quarterly. Rather, FSC apparently acted reasonably by using its historical cost as the best estimate it could make of the value of its inventory.[5] Whatever risk existed that the current market price would exceed the historical cost was taken by Sun Insurance when it issued a replacement cost policy. In fact, if the market price had declined, FSC's recovery might be *less* than its historical cost. This, in our view, is the essence of a "replacement cost" policy.[6]

### III.

Having determined that the district court's construction of the insurance policy was erroneous, we now approach the much more difficult task of attempting to identify a workable and appropriate measure of recovery under the policy. We will not presume to set a precise amount of damages. That function is for the district court to perform. We will, however, undertake to provide some guidance.

■■■ We believe that FSC's recovery must be measured in general by the amount it was reasonably required to expend to put itself in the position it would have occupied had the fire not occurred. Several considerations support this conclusion, the first and most important being the plain language of the policy which insures for "replacement cost at time and place of loss." The Illinois Supreme Court has recently reaffirmed the principle that "where the provisions of a policy are clear and unambiguous, it is the duty of the court to enforce them according to their plain meaning." *Thornton v. Illinois Founders Ins. Co.*, 84 Ill.2d 365, 371, 49 Ill.Dec. 724, 418 N.E.2d 744, 747 (1981). And the meaning of "replace," according to Black's Law Dictionary and the Illinois Supreme Court is "to restore to a former condition." BLACK'S LAW DICTIONARY 1168 (5th ed. 1979) (citing *Illinois Central R.R. Co. v. Franklin County*, 387 Ill. 301, 309, 56 N.E.2d 775, 779 (1944)).[7]

The basic principle that must guide the district court on remand in measuring the damages in this case is that a replacement cost policy, by definition, provides a "make-whole" remedy. Such a remedy must strive to approximate the situation FSC would have occupied had the fire not occurred; there must be a relationship of cause and effect between the fire and the replacement purchases. Essentially, this means that Sun Insurance must pay for whatever purchases FSC made *to replace* the burned Special Pack, if those purchases

---

5. Sun Insurance, of course, might have claimed a premium adjustment based upon an alleged inaccuracy in FSC's reports. We note however that the district court explicitly found FSC's reporting method to be reasonable. Further, Sun Insurance was always apprised of the tonnage of Special Pack in FSC's warehouse and nothing prevented Sun Insurance, of course, from independently investigating the potential replacement cost at risk. Further, even if it may appear inequitable for FSC to recover its full replacement cost when it might have been underreporting the amount at risk, we cannot alter our construction of the contract to avoid this sort of perceived inequity. As the Illinois Appellate Court has stated, "unless a contract is ambiguous, its meaning must be determined from the words used; courts will not, simply because a more equitable result might be reached, construe into the contract provisions that are not there." *National Bank of Bloomington v. West Construction Co.*, 41 Ill.App.3d 686, 689, 355 N.E.2d 43, 47 (1976). And we are unable to locate a provision in the contract at issue in this case that limits recovery to stated value.

6. The dissent charges us with ignoring the "plain words" of the policy and of writing an "advisory opinion." We do not understand these allegations. It is the dissent's view that the policy is ambiguous and it is the dissent that

would ignore the "plain words" of the policy. As to the "advisory opinion" charge, we can only plead guilty to attempting, as best we can, to advise the district court as to the proper course on remand.

7. The parties have not cited very much authority that has proven helpful in determining the meaning of "replacement cost" in the policy, and our own research has not proven much more successful. It seems that replacement cost as a sole standard is not the usual measure of damages in property damage policies. Rather, most of the cases we have located involve policies in which the insurance company's liability was expressly limited to the smallest of a) policy limits; b) repair cost; c) replacement cost; or d) actual cash value. *See, e.g., National Tea Co. v. Commerce & Industry Ins. Co.*, 119 Ill.App.3d 195, 198, 74 Ill.Dec. 704, 456 N.E.2d 206, 209 (1983). In a case involving a policy of this sort, *Mechanics' Ins. Co. of Philadelphia v. C.A. Hoover Distilling Co.*, 182 F. 590, 597 (8th Cir.1910), the court held that the insured was entitled to recover, as replacement cost, "the cost of immediately replacing that product in the most inexpensive way by purchase or otherwise with a similar product of like kind and quality." That case supports our view that "replacement cost" coverage entails a remedy designed, as well as possible, to place the insured in the position it would have occupied had the loss not occurred.

were made in a commercially reasonable manner.[8] In other words, the district court must decide, as a factual matter, which purchases FSC made that would not have been made absent the fire (the "avoidable" cost). The cost of these purchases, in our view, would constitute the replacement cost.[9]

■ FSC has argued that it should be compensated for the first purchases it made after the fire which resulted in *increasing* its inventory to the extent of 12,827 tons. These purchases were made from March through May 1980 and cost a total of $1,169,197.00. We cannot accept, as a matter of law, FSC's proffered measure of damages because we are uncertain whether or not these purchases would have been made even if the fire had not occurred.[10] In February 1980, FSC's inventory had been reduced to 2,392 tons from the pre-fire level of approximately 30,000 tons. If FSC's goal was to rebuild its inventory to the, pre-fire 30,000 ton level, then the *last* 12,827 tons purchased before inventory again reached that level might properly be characterized as replacement of the loss.

■ Contrary to Sun Insurance's suggestion, our interpretation of the policy does not excise the "time and place of loss" qualifications from the measure of recovery as provided in Endorsement 11. If FSC acted reasonably in replacing the paper, then the cost it actually incurred would be the best evidence of the replacement

cost at the time of the loss. Due to the thin and volatile market for Special Pack, it may have been unreasonable, or even impossible, to replace the Special Pack immediately after the fire. We interpret the "at time and place of loss" proviso to require FSC, since it chose to replace property covered by the policy, to do so within a commercially reasonable time, with a concern, *inter alia*, for not driving the price up through overly concentrated purchases. The district court must, of course, assess the commercial reasonableness of FSC's chosen course of conduct.

### IV.

Therefore, the judgment of the district court is reversed and the case is remanded for a redetermination of the appropriate measure of the loss. Circuit Rule 18 shall not apply.

COFFEY, Circuit Judge, dissenting.

On appeal, this court is called upon to interpret the language, contained within an insurance contract, that governs the amount of recovery intended by the plaintiff, FSC Paper Corp. ("FSC"), and the defendant, Sun Insurance Co. of New York ("Sun Insurance"). The parties agree that throughout the five-and-one-half year period preceding the fire in question, FSC adhered to the terms of the contract and supplied Sun Insurance with quarterly reports, stating the value of the Special Pack inventory at risk in FSC's warehouse. Ir-

---

8. If no purchases replaced the lost Special Pack, or if purchases were made in an unreasonable manner, then the district court should award the cost it finds FSC would have incurred to replace the Special Pack in a reasonable manner. We recognize that such calculations may not be exact, but we are confident that a close approximation can be made.

9. The district court indicated, in its order, that if it did not find that the damages were to be measured by the reporting value, it would use the cost of the first 12,827 tons of Special Pack purchased by FSC after the fire as the measure of damages. Under our view of the case, this measure of damages would only be appropriate if the district court were to find on remand that these purchases would not have been made had the fire not occurred.

10. We do not mean to foreclose the district court from finding, as a factual matter, that the March through May 1980 purchases were in replacement of the lost paper. It appears that in February 1980, FSC's inventory had reached a dangerously low level. This low inventory resulted, at least in part, from the loss of the 12,827 tons of Special Pack. FSC may, therefore, have been forced, by the fire, to purchase paper at a higher price than would have applied had the fire not occurred. If the district court finds, as a matter of fact, that the necessity of purchasing "expensive" paper was caused by the fire, it should award damages commensurate with the cost of those purchases.

respective of this five year business practice and course of dealing, FSC claimed that following the fire on July 8, 1979, it was entitled to a recovery of replacement cost, a sum well in excess of the value stated in its quarterly report of June 30, 1979, just eight days previous to the fire.

Based upon a thorough review of the entire insurance contract, the trial court judge determined that the reporting requirement of Endorsement 11 was ambiguous. The trial judge, in order to resolve that ambiguity and properly interpret the intent of FSC and Sun Insurance on the issue of recovery, reviewed and weighed the extensive evidence presented at trial, including the parties' prior practices, procedures, reporting methods, and business dealings. Following this review of the evidence, the trial judge entered findings of fact and concluded that "[u]nder the reasonable and businesslike interpretation of the policy ... Sun Insurance was required to determine 'replacement cost at time and place of loss' on the basis of the values reported [quarterly] by FSC...." The majority completely rejects the trial judge's construction of the insurance contract on the basis that "nothing in the policy explicitly made the linkage between reported value and replacement cost." In reaching this conclusion, the majority misconstrues the Illinois law governing the construction of insurance contracts, ignores FSC's five-and-one-half year business practice of filing quarterly value reports with Sun Insurance, and utterly fails to consider the trial judge's findings of fact concerning the parties' intent on the issue of recovery. As a result, the majority erroneously holds that FSC is entitled to a recovery that far exceeds the value of Special Pack inventory, as reported by FSC in the quarterly report

of June 30, 1979, just eight days previous to the loss in question.[1] I dissent.

The underlying facts are undisputed. On December 31, 1973, FSC and Sun Insurance entered into an insurance contract that covered the inventory of Special Pack waste newspaper stored in FSC's warehouse. The policy was in full force and effect on July 8, 1979, when a fire destroyed 12,827 tons of the Special Pack inventory. According to FSC's amended value report, the Special Pack had a monetary value of $611,719.63, or $47.69 per ton, as of June 30, 1979,[2] but following the fire that occurred just eight days later, FSC claimed that it was entitled to recover $91.15 per ton, or $1,169,197.00. Sun Insurance disputed FSC's inflated valuation of recovery and FSC, in turn, filed this lawsuit.

The immediate controversy stems from two provisions included within the insurance contract that must be read jointly. Endorsement 11 of the policy provides:

"VALUATION: In case of loss the basis of adjustment for all property covered by this policy, except personal property [of] employees, shall be replacement cost at time and place of loss. Personal property of employees shall be on the basis of actual cash value at time of loss.

When rendering reports as provided in Section 11, values are to be reported on an equivalent basis."

Section 11 of the policy provides in pertinent part:

"REPORTS AND PREMIUMS: Within 60 days after the end of each quarter the Assured shall report to the Company the total values of all property at risk under this policy on the last business day of that quarter. Once during each calender year the Assured shall report to the

1. According to FSC's amended quarterly report, the value of its Special Pack waste newspaper inventory, as of June 30, 1979, was $47.69 per ton. The fire of July 8, 1979, destroyed 12,827 tons of the Special Pack inventory, totalling $611,719.63 worth of damage at FSC's reported value. The record reveals that under the majority's complex replacement cost calculation, it is possible that FSC will receive $1,169,197.00 in damage recovery.

2. The record reveals that on July 20, 1979, FSC claimed the value of its Special Pack was $45.04 per ton as of June 30, 1979. On August 10, 1979, approximately one month after the fire, FSC amended its report claiming that the value of its Special Pack was $47.69 per ton as of June 30, 1979.

Company the values of property at risk as of quarter September 30 by locations (as defined by Section 6 hereinabove)." Based upon the extensive evidence presented at trial, the trial judge found that Endorsement 11 of the policy "constitutes a valuation provision which is intended to fix the value of destroyed property at a specific time and place...." The trial judge further determined that "[t]he words 'equivalent basis' ... are not clear when read in isolation, but their meaning is clarified when viewed in the light of evidence of the [prior] practices and procedures of the parties." According to the trial judge, the term "equivalent basis" means that "values of all property (except that of employees) are to be reported on the same basis as provided in Section 11 of the policy. Endorsement 11 then uses such reports for valuation reports for purposes of adjustment." The trial jduge added that "Endorsement 11 provides for replacement cost at 'time and place of loss' which ... ties down the valuation figure to a specifically ascertainable amount when reported under Section 11." Based upon these findings, the trial judge concluded that "[u]nder the reasonable and businesslike interpretation of the policy, including the last sentence of Endorsement No. 11, Sun Insurance was required to determine 'replacement cost at time and place of loss' on the basis of the values reported by FSC under Section 11."

The majority completely rejects the trial court judge's construction of the insurance contract. According to the majority, under Illinois law, "courts should not add terms to the [insurance] policy" and in this case, "because the parties did not provide in their contract that replacement cost was limited by the reported value, we are not free to add such a term." The majority asserts that its result, which places absolutely no limit on the amount of recovery, complies with "traditional concepts of contract construction." I disagree with the majority's oversimplified analysis of the parties' insurance policy. The law in Illinois clearly provides that *"the primary object in the construction of an insurance policy is to determine the intent of the parties." Seeburg Corp. v. United Founders Life Ins.*, 82 Ill.App.3d 1034, 1039, 38 Ill.Dec. 272, 403 N.E.2d 503, 506 (1980) (emphasis added). According to the Illinois Supreme Court, "[i]n order to ascertain the intent of the parties the court should not examine the [insurance] policy in a vacuum but should look to the circumstances surrounding the issuance of the policy, such as the situation of the parties and the purpose for which the policy was obtained." *Dora Township v. Indiana Ins. Co.*, 78 Ill.2d 376, 378, 36 Ill.Dec. 341, 400 N.E.2d 921, 922 (1980). Moreover, if a term within the insurance policy is "ambiguous and uncertain, the court should consider extrinsic matters such as the purpose sought to be accomplished, the subject matter of the contract, and the circumstances surrounding the issuan of the policy, *as well as the conduct of the parties when acting thereunder." Seeburg Corp. v. United Founders Life Ins.*, 82 Ill.App.3d at 1039, 38 Ill.Dec. at 275, 403 N.E.2d at 506 (emphasis added) (citations omitted). *See also Great Central Insur. Co. v. Bennett*, 40 Ill.App.3d 165, 171, 351 N.E.2d 582, 587 (1976).

The general rule in Illinois is that the construction of an insurance policy contract is a question of law. *Michigan Chemical Corp. v. American Home Assur. Co.*, 728 F.2d 374, 377 (6th Cir.1984); *First Nat. Bank Co., Etc. v. Insurance Co.*, 606 F.2d 760, 768 (7th Cir.1979); *Rogers v. Robson, Masters, Ryan, Brumund, Etc.*, 74 Ill. App.3d 467, 470, 30 Ill.Dec. 320, 392 N.E.2d 1365, 1369 (1979), *aff'd*, 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980); *Illinois Casualty Co. v. Peters*, 73 Ill.App.3d 33, 34, 29 Ill.Dec. 284, 391 N.E.2d 547, 548 (1979). However, Illinois law further provides that when an ambiguity arises and "the meaning of the contract is uncertain in light of the extrinsic evidence, then the intent of the parties must be determined as a question of fact...." *Sunstream Jet Exp. v. International Air Service Co.*, 734 F.2d 1258, 1270 (7th Cir.1984) (quoting *Nerone v. Boehler*, 34 Ill.App.3d 888, 891, 340 N.E.2d 534, 537 (1976)). *See also* 2 M.

Rhodes, *Couch on Insurance* 2d § 15:3 at 120–21 (1984) (the meaning of ambiguous words in an insurance policy is a question of fact). On appeal, the trial judge's findings of fact on extrinsic matters must be upheld unless clearly erroneous. *See* Fed. R.Civ.P. 52(a). Our deference is premised upon "the unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969)). Thus, unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we are bound to accept the trial court judge's findings of fact. *See Hanna v. American Motors Corp.*, 724 F.2d 1300, 1309 n. 8 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984); *Medtronic, Inc. v. Benda,* 689 F.2d 645, 647 (7th Cir.1982), *cert. denied,* 459 U.S. 1106, 103 S.Ct. 731, 74 L.Ed.2d 955 (1983). Rather than adhere to this well-settled standard of review, as it applies to the construction of insurance contracts, the majority has chosen to conduct an inappropriate, unnecessary, and inaccurate *de novo* review of the parties' contract.

According to the majority, the insurance contract between FSC and Sun Insurance "is unambiguous in its provision for recovery at replacement cost 'at time and place of loss,' " and thus it is "unnecessary, and even inappropriate, to address" the trial judge's findings of fact concerning the parties' original intent. The majority arrives at this erroneous conclusion by separating the replacement cost provision of Endorsement 11 from the overall contract and interpreting it in isolation from the "equivalent basis" reporting provision included within that very same section. The majority's flawed analysis directly contravenes a basic tenant of Illinois law that an insurance policy must be construed as a whole

and "effect must be given to each word, clause, or term employed by the parties, and none may be rejected for lack of meaning or as surplusage." *Reserve Ins. Co. v. General Ins. Co.*, 77 Ill.App.3d 272, 280, 32 Ill.Dec. 552, 395 N.E.2d 933, 938 (1979). Indeed, "when the intention of the parties is sought from the [insurance policy] itself, it must be gathered from the entire instrument, rather than from isolated portions, and the policy should be construed as a whole." 13 J. Appleman, *Insurance Law and Practice* § 7385 at 129–31 (1976). The terms of an insurance policy cannot be read in isolation to achieve a desired result and thereby gain an inflated recovery.

In contrast to the majority's improper interpretation of the contract, the trial judge properly construed the insurance contract as a whole, concluding that under the policy, FSC is entitled to recover "replacement cost at time and place of loss," based upon the quarterly value reports that FSC is required to file with Sun Insurance. According to Endorsement 11 of the policy these quarterly "values are to be reported on an equivalent basis." The term "equivalent basis," when used in this context, is undefined, indefinite, and obscure in meaning, thus rendering Endorsement 11 of the policy ambiguous under Illinois law. *See Sunstream Jet Exp. v. International Air Service Co.*, 734 F.2d at 1269, and cases cited therein. In order to equitably resolve this ambiguity and properly determine the parties' intent on the issue of recovery, the trial judge reviewed and weighed the extrinsic evidence presented at trial, including testimony and exhibits of the parties' prior practices, procedures, reporting methods, and business dealings. Based upon evidence that the cost of Special Pack varies daily and sometimes widely and that FSC, for the five-and-one-half year period preceding the fire, "consistently reported the value of its waste newsprint at risk in the Crawford Warehouse on the basis of the dollars per ton for ending inventory," the judge construed the entire Endorsement 11, including the replacement cost provision *and* the equivalent basis reporting provi-

sion, as requiring Sun Insurance to "determine 'replacement cost at time and place of loss' on the basis of the values reported by FSC under Section 11." Thus, unlike the majority, the trial judge properly applied Illinois law and reviewed the insurance policy in its entirety, including the *complete* language of Endorsement 11, to determine the parties' intent on the issue of recovery at replacement cost.

According to the majority's oversimplified interpretation of the insurance contract, "nothing in the policy explicitly made the linkage between reported value and replacement cost." Here again the majority fails to interpret Endorsement 11 in its entirety, including the replacement cost provision *and* the "equivalent basis" reporting provision. The presence of these two provisions within the very same section of the insurance policy is clearly sufficient "linkage" to support the district court's finding that "replacement cost at time and place of loss" is based upon the values reported by FSC.

Furthermore, the trial court judge's construction of the insurance policy comports with the application of common sense, the parties' previous course of conduct, and sound business principles. For the five-and-one-half year period preceding the fire in question, Sun Insurance received quarterly value reports from FSC. These quarterly reports allowed Sun Insurance to calculate the amount of inventory at risk in FSC's warehouse, annually adjust FSC's premium payment, and accurately project any future liabilities while allowing FSC to pay premiums based upon its fluctuating inventory rather than a fixed price. *See, e.g., Standard Lumber Co. v. Travelers Indemnity Co.*, 440 F.2d 544, 546 (7th Cir. 1971). Under the majority's construction of the insurance policy, the very purpose of the quarterly reporting requirement is rendered meaningless because an insured such as FSC is permitted to report an inventory at a low value (i.e. historical cost) for premium purposes and then turn around and claim recovery for loss at a higher value (i.e. actual replacement). In this situation the insurer has absolutely no guarantee as

to the extent of its potential liability and the insured has the windfall of low premium payments and high recovery at the time of loss. The eventual result of the majority's inaccurate, "deep-pocket" analysis is financial disaster for the insurer.

I further note that the majority's assertion, "it could just as easily have been the reverse," that is, reporting inventory at a high value and claiming recovery for loss at a low value, defies logic. Certainly FSC filed quarterly value reports with the expectation that it would receive that value in the event of loss, just as Sun Insurance requested quarterly reports to annually adjust FSC's premiums, limit potential losses, and accurately project future liabilities. A contrary interpretation of the "equivalent basis" reporting requirement renders the provision absolutely meaningless, subjecting Sun Insurance and other insurance companies who underwrite policies of this nature to serious financial problems. In short, the majority's position, as well as FSC's conduct, is a complete aberration of the parties' insurance contract and the accepted practice in the insurance business to periodically report inventory values and thereby calculate the amount of insurance and the amount of premiums in direct proportion to the value of the goods at risk. *See* 15 M. Rhodes, *Couch on Insurance 2d* § 54.91 at 478–79 (1983); 4 J. Appleman, *Insurance Law and Practice* § 2377 at 420–22 (1969).

After thoroughly examining the entire insurance contract, the trial judge properly determined that the "equivalent basis" reporting requirement of Endorsement 11 was ambiguous. Following a review of the extrinsic evidence presented at trial, the judge found that under the terms of the insurance policy FSC and Sun Insurance did not intend for FSC to realize an unjust windfall. Unlike the majority, I adhere to the clearly erroneous standard of review and defer to the trial judge's findings, as he was in the best position to evaluate the credibility of the witnesses and to weigh the evidence and exhibits presented at trial. Indeed, upon review of the entire record I

am certainly left with no definite and firm conviction that a mistake has been committed. In fact, I agree with the trial court judge's construction of the *entire* Endorsement 11, including the replacement cost provision *and* the equivalent basis reporting provision that FSC's recovery is limited to $47.69 per ton, the amount contained in FSC's amended value report for June 30, 1979, just eight days previous to the loss in question. To borrow a line from Judge Cudahy's dissent in *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007 at 1022 (7th Cir.1984) (Cudahy, J., dissenting), "the majority has ... interpreted the [insurance policy] in a way contrary to the plain words used by the parties and has completely ignored the district court's understanding of these words." As a result, the majority embarks upon a complex and rather confusing advisory opinion concerning replacement cost calculation in this case. I dissent from the majority's improper construction of the parties' insurance contract, as well as the majority's unwarranted analysis of replacement cost.