**MEDLINE INDUSTRIES, INC., Plaintiff,**

v.

**H. Royal GRUBB, Defendant.**

No. 87 C 8038.

United States District Court, N.D. Illinois, E.D.

Oct. 8, 1987.

Robert E. Shapiro, Wendi Sloane Weitman, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, Ill., for plaintiff.

Arnold A. Pagniucci, Melissa B. Patack, Jeffrey T. Gilbert, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff, Medline Industries, Inc. ("Medline"), brought this diversity action for injunctive relief against its former employee, H. Royal Grubb ("Grubb"), to enforce a restrictive covenant contained in Grubb's employment agreement with Medline. Medline originally sought to have this Court enter a temporary restraining order on September 17, 1987. However, this Court did not hold a hearing on Medline's motion for a temporary restraining order at that time because we found that Medline's attempts to serve Grubb were inadequate and that Medline did not demonstrate to this Court's satisfaction that the circumstances required this Court to enter an *ex parte* temporary restraining order. This Court ordered Medline's counsel to perfect service on the defendant and reset the hearing on Medline's motion to September 22, 1987. On September 22, 1987, Medline appeared with witnesses for the hearing. Counsel representing the defendant appeared; however, Grubb's counsel was unable to proceed with the hearing because counsel alleged that its client was not informed that the Court planned to conduct a hearing on September 22, 1987.[1] Consequently, the Court reset the hearing on the temporary restraining order for September 23, 1987. After hearing the evidence and upon reviewing the applicable law, this Court denies Medline's motion for a temporary restraining order.

## FACTS

Medline is a Illinois corporation with its principal office located in Mundelein, Illinois. Medline is engaged in the manufacture and sale of a complete line of hospital supply products. Medline has seven different divisions. The textiles division, the largest division, accounts for forty percent of Medline's sales.

Medline does a substantial amount of business on the West Coast. Medline has a branch in California, a fully-stocked warehouse and a large number of employees who sell its products. Medline has been soliciting business in the west coast market for approximately twelve years and, according to its complaint, the west coast market "has become a significant part of [its] U.S. operations." (Complaint, ¶ 5).

Grubb is a former sales representative and divisional sales manager for Medline. Medline first employed Grubb as a sales representative on May 8, 1982. Grubb had had previous sales experience, although that experience was not in the hospital supplies market. When Grubb joined Medline, he signed an employment agreement which contained a restrictive covenant. Essentially, the restrictive covenant contained in the sales representative's employment agreement seeks to prevent the sales representative from soliciting orders from, or selling to, or rendering services to any customers that the sales representative has solicited, serviced, or sold to in the course

1. Medline's counsel stated that Continental Textile ("Continental"), Grubb's current employer, was contacted and was told of the prior appearance before this Court. However, Continental is not a party to this action and this Court finds that such notice was not sufficient.

of his employment with Medline. (Plaintiff's Ex. 2, ¶ 8(a)). In June, 1984, Medline promoted Grubb to the position of divisional sales manager. Once again, Grubb signed a standard management contract that included a restrictive covenant. The restrictive covenant contained in the manager's contract is broader than than the restrictive covenant contained in the sales representative's employment contract.[2]

After Medline hires a sales representative, it provides the representative with a three-week course of training. For one week, the representative attends seminars at Medline's corporate headquarters. These seminars educate the representative about each of Medline's seven divisions and their products. Each representative receives "on-the-job" training whereby an experienced trainer accompanies the new employee when calling on customers. In addition, Medline provides its sales force with information about its products, prices, and,

sometimes, the customers upon whom the representative will call.

Medline's sales representatives are responsible for persuading hospitals to purchase Medline products.[3] To achieve their objective of selling Medline products, the sales representatives call on potential customers, sometimes with great frequency, and often entertain these customers. Generally, Medline bears the cost of entertaining customers.[4]

On August 1, 1987, Grubb resigned his position at Medline. Soon after he resigned, Grubb was employed by Continental Textiles, a competitor of Medline. Grubb worked for Continental for approximately one month when Medline sued to enforce the restrictive covenant contained in his divisional sales manager's contract because of his alleged solicitation of Medline's key customers in the California market.

---

**2.** In paragraph 6 of the employment agreement, Grubb made the following promises:

"(a) Manager recognizes that he has an eminently valuable overall knowledge of and access to Medline's suppliers, costs, purchases, contracts, trade secrets, prices, customers and customers' needs, and proprietary knowledge of Medline's entire business operation, which, if lost, could cause Medline irreparable injury. Accordingly, Manager agrees that during the term of this Employment Agreement, and for a further term of one (1) year, beginning on the date of termination of this Employment Agreement for any reason, without the prior written consent of Medline, he will not, as principal, agent, partner, employee, director or in any individual or representative capacity whatever, directly or indirectly, own, manage, operate, join, control, be employed by or participate in the ownership, management, operation, control or conduct of, or be connected in any manner with any business of the type and character of business engaged in by Medline at the time of such termination, if such business is offering products or services to customers of Medline in the territory managed by Manager.

(b) Manager further agrees that he will keep confidential all information relating to the conduct and the details of Medline's business, including, but not limited to, information relating to Medline's suppliers, costs, purchases, contracts, customers and customers' needs.

(c) Manager further agrees that he will not enter into any agreements with or solicit the employment of employees of Medline for the purpose of causing said employees to leave Medline

or to take employment with a competitor of Medline during the term of this Agreement, and for a further term of one (1) year, beginning on the date of termination of this Employment Agreement for any reason.

(d) The provisions of this Paragraph 6 shall survive the termination of this Employment Agreement. Medline and Manager recognize that the services rendered by Manager are special, unique and of an extraordinary character, and that in the event of the breach by Manager of the terms and conditions of this Employment Agreement to be performed by him, or in the event Manager violates any provisions of this paragraph 6, Medline shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction to enforce the specific performance thereof by Manager, or to enjoin the Manager from performing services for any such other person, firm or corporation, during the period herein contracted for."

**3.** Although Medline's witnesses stated that there was a wide-range of potential customers to whom they hoped to sell, the specific testimony regarding their actual customers was limited to hospitals.

**4.** Richard Nelson, Medline's current divisional sales manager for the West Coast, testified that if a Medline sales representative is salaried, Medline bears the cost of entertaining that sales representative's customers. However, if a sales representative works on a straight commission, that sales representative bears his own cost of entertainment.

In its complaint, Medline alleged that Grubb directly and indirectly solicited Medline's key customers. Furthermore, Medline alleged that Grubb retained confidential pricing and customer information and that he was using such confidential information to narrowly underbid Medline. Medline seeks to enjoin Grubb from soliciting Medline's key customers and from using any confidential information he may have retained.

## APPLICABLE LAW

A district court sitting in diversity must apply the substantive law suggested by the forum state's conflicts rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 1021–1022, 85 L.Ed. 1477 (1941); *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1080 (7th Cir.1986). In this case, the employment agreement recited that the rights of the parties would be construed in accordance with Illinois law. Illinois courts will enforce a contractual choice of law provision. *Sarnoff*, 798 F.2d at 1081. Consequently, Illinois law governs this action.[5]

In deciding whether injunctive relief is appropriate, this Court applies the following criteria: 1) the plaintiff seeking the injunctive relief must demonstrate a reasonable likelihood of success on the merits; 2) the plaintiff must demonstrate that it has no adequate remedy at law; 3) the plaintiff will suffer irreparable injury if the injunctive relief does not issue; 4) the irreparable harm the plaintiff will suffer absent the injunctive relief is greater than the irreparable harm the defendant will suffer if the injunctive relief is granted; and 5) the public interest will not suffer harm if the injunctive relief is granted. *Brunswick Corp. v. Jones*, 784 F.2d 271, 273–274 (7th Cir.1986); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386–387 (7th Cir.1984); *U.S. v. Phillips*, 527 F.Supp. 1340, 1343 (N.D.Ill.1981). Where the five criteria are met, this Court will issue the requested injunctive relief.

### 1) A Reasonable Likelihood of Success on the Merits

Under Illinois law, courts will enforce a restrictive covenant contained in an employment agreement where the employer demonstrates three requirements. First, the employer must demonstrate that the employment contract is a valid, binding agreement. Second, the employer must demonstrate that the restrictive covenant is designed to protect a legitimate interest of the employer. Third, the employer must demonstrate that the restrictive covenant is reasonable in its scope. *See, Medtronic, Inc. v. Benda*, 689 F.2d 645, 653 (7th Cir. 1982). Because Medline is unable to satisfy two of these requirements, it cannot demonstrate a reasonable likelihood of success on the merits. Even assuming that this employment agreement is valid,[6] the

---

**5.** Although Grubb conceded that his employment agreement provides that Illinois law applies, he argued that, under Illinois' conflict of laws principles, this Court should apply California law. (Defendant's Motion to Dismiss, at 2). This Court recognizes that, *in the absence of an agreement by the parties*, this Court would apply the law of the state with the most significant relationship to the transaction. *Dr. Franklin Perkins School v. Freeman*, 741 F.2d 1503, 1515 n. 19 (7th Cir.1984). *Absent the parties' agreement*, this Court would construe their agreement according to California law because the agreement was negotiated, executed and performed in California and the agreement, if enforced, would prevent Grubb from practicing his trade in California. However, this is not the case before this Court. In this case, the parties provided that Illinois law governed their agreement. (Plaintiff's Ex. 3, ¶ 2). Illinois courts have long enforced agreements regarding choice

of law. *Sarnoff v. American Home Products Corp.*, 798 F.2d at 1081, *citing McAllister v. Smith*, 17 Ill. 328, 333 (1856). Accordingly, this Court will honor the parties' intent and apply Illinois law.

**6.** In his affidavit in support of his motion to dismiss, Grubb stated that before he signed the sales representatives' employment agreement, he expressed his desire not to sign an agreement containing a restrictive covenant because such covenants were unenforceable under California law. Grubb stated that Mike Hobbs, the divisional vice-president of sales for Medline, assured him that Medline understood that Medline could not enforce the restrictive covenant in California. Nevertheless, Medline insisted that Grubb sign the employment agreement as written. Grubb contends that he signed both employment agreements in reliance on Hobbs'

restrictive covenant is unenforceable because, as written, it is not reasonably drawn to protect any legitimate interest of Medline.

### a) *A Protected Interest*

Under Illinois law, an employer may use a restrictive covenant to protect either of two particular interests: 1) a near-permanent customer base, and 2) confidential information. In its complaint, Medline alleged that Grubb retained confidential information relating to Medline's costs, suppliers, pricing, customers and customer needs. (Complaint, ¶ 8). At the hearing, Medline argued that Grubb retained computer analyses which contained this information for the sales territories he managed. In fact, Medline submitted a voluminous computer printout[7] containing such information and questioned its witnesses to establish its confidentiality and to establish Grubb's alleged retention and use of this information. However, Medline was unable to demonstrate that the information contained in these reports was confidential or that Grubb retained or used the information.

 Medline attempted to establish the confidentiality of the information contained in the computer analyses through two witnesses. Courtland Larkin, corporate vice-president of sales for Medline, testified that the computer analyses contained confidential information regarding Medline's product descriptions and numbers, the last price paid by each customer, the last percentage commission paid on each sale, the date of the last sale and the names of the customers who purchased the product. In addition, Larkin testified that Grubb could determine Medline's "base cost"[8] by deducting the last commission paid from the last price paid. Once Grubb determined Medline's base cost for each product, Grubb could use the information to narrowly underbid Medline's sales representatives. Larkin specifically stated that Medline considered the information contained in the computer analyses to be of a confidential nature.

Many of the facts testified to by Larkin were contradicted, or at least discounted, by Medline's next witness, Richard Nelson, the current divisional sales manager for the West Coast. Nelson testified that the names of many, if not all, of Medline's customers are listed in a health care directory which could be purchased by any interested party. (Defendant's Ex. 5). Second, Nelson testified that much of the information contained in Medline's computer reports was available in the market. Many health care facilities obtained their textiles products through an open bidding procedure. Such bids are public information. Medline bids for those contracts, and to that extent, its customers and product information is in the public domain. Furthermore, Medline encourages and rewards its sales representatives if they are able to obtain information regarding its competitor's level of sales for a particular product to a particular customer. (Defendant's Ex. 2, 3, 4). Nelson testified that customers would provide information regarding Medline's competitors to him. It is naive to think that those same customers would not provide similar information about Medline to Medline's competitors. In fact, Nelson likened this process to doing "homework for a sales call."

Nelson did testify that he considered the information contained in the computer analyses to be confidential. He kept the computer analyses in a file in his home and did not allow others access to them. However, Nelson also testified that Medline did not include any clause requiring its sales

---

assurances. (Affidavit of Royal H. Grubb, ¶¶ 2, 3).

**7.** To protect any claim of confidentiality, Medline filed this exhibit under seal.

**8.** Larkin testified that the "base cost" is the lowest price at which Medline will sell its products. Because Medline is a for-profit organiza- tion, this Court assumes that Medline has built in a profit margin to its base cost. This assumption is supported by Larkin's own testimony. When asked if Medline's sales representatives knew either Medline's cost of purchase or cost of manufacture, Larkin stated that Medline does not disclose its cost figures to its sales personnel.

managers to return confidential information to Medline. Furthermore, Nelson testified that Medline did not require the return of any of the computer analyses when new reports were issued. In fact, when new reports are issued, Nelson merely discards them.

Both of Medline's witnesses testified that Grubb retained the computer analyses and price lists after he left Medline. However, during cross-examination, Nelson completely contradicted both his testimony on direct and Larkin's testimony. Specifically, Nelson testified that, in early August, computer printouts were left on his back porch, that he had never seen any Medline price lists in Grubb's possession after Grubb left Medline's employ, that he picked up a personal computer and the operating manuals from Grubb after Grubb left Medline's employ, and that, at the request of Medline, Grubb dictated and sent to Medline information about the sales representatives he supervised. Although the credibility of Nelson's overall testimony is questionable, we find that the testimony elicited during cross-examination demonstrates that Grubb did not retain any Medline information, confidential or otherwise, when he left Medline's employ. Based upon the testimony of Medline's own witnesses, this Court finds that the information contained in the computer analyses is not confidential and that Grubb did not retain such information.

▮ Medline also asserts a legitimate, protected interest in its customer base. To demonstrate such an interest, Medline must show that it had a long-standing, though not exclusive, relationship with its customers. *Medtronic, Inc. v. Benda,* 689 F.2d 645, 655 (7th Cir.1982). Under Illinois law, courts will find that a near-permanent relationship exists where an employer demonstrates that it has "exceeded traditional boundaries of salesmen responsibilities" to develop the customer base, *Medtronic, Inc. v. Benda,* 689 F.2d at 656, *quoting Wessel Co. v. Busa,* 28 Ill.App.3d 686, 692, 329 N.E.2d 414, 419 (1st Dist.1975), and the employee would not have had contact with the customer but for his relationship with the employer.

Although Grubb had never sold textiles before Medline employed him, and, thus, would not have had contact with textile customers prior to his employment at Medline, Medline was unable to demonstrate that it had developed a near-permanent relationship with its customers. Instead, Medline's testimony demonstrated that the textile-health care market is highly competitive and that Medline shared its customers with its competitors. In fact, many customers belong to buying groups which negotiate and execute dual contracts with two competitors. Furthermore, while a dual contract does bind the competitors who execute the dual contract to specific prices, it does not bind the customer. Thus, any customer who belongs to a buying group can choose to buy under the buying group contract or it can choose to negotiate a lower price with a third competitor.

Although Medline cited *Medtronic, Inc. v. Benda,* 689 F.2d 645 (7th Cir.1982), with great frequency in support of its customer base argument, *Medtronic* is distinguishable from this case. In *Medtronic,* the Court found that Medtronic had established a close, professional relationship with its customers and that such a relationship was entitled to protection. *Medtronic, Inc. v. Benda,* 689 F.2d at 655. Medtronic sold pacemakers to hospitals. It, however, developed its close, professional relationship with the hospital through the prescribing physicians. In developing these relationships, Medtronic "exceeded traditional boundaries of salesmen responsibilities." *Id.,* 689 F.2d at 656, *quoting Wessel Co. v. Busa,* 28 Ill.App.3d 686, 692, 329 N.E.2d 414, 419 (1st Dist.1975). In addition to entertaining the physicians, Medtronic trained its sales representatives to give technical assistance to the physicians regarding the pacemakers while the physicians were inserting them in patients.

Unlike Medtronic, Medline did not present any evidence that its sales representatives possessed any special or technical information about Medline's textile products. Medline's sales representatives often developed information regarding a customer's needs; however, as the discus-

sion regarding the confidentiality of this information suggests, much of the information was in the public domain. Finally, although Medline expended large amounts of money entertaining potential customers, the evidence demonstrated that its competitors also entertained potential customers. Medline was merely using an age-old sales technique to curry favor with the customer. In this case, Medline's extensive entertaining did not exceed the traditional boundaries of sales representative responsibilities and, consequently, its investment in its customer base does not give rise to a protected interest.

b) *The Scope of the Restrictive Covenant*

 The restrictive covenant, as written, is unenforceable because it is overbroad. The temporal scope of one year is appropriate; however, the geographic scope is entirely too broad. Medline's restrictive covenant, as written, seeks to prevent Grubb from working for a competitor of Medline's anywhere in the United States. Although Medline's counsel advised this Court that it was seeking to enforce the covenant narrowly, one of Medline's witnesses, Courtland Larkin, testified that under the covenant, as written, he understood that Medline could sue to enforce the restrictive covenant against an ex-employee who worked for a competitor of Medline's even where the ex-employee was working in a completely different geographic area than the one in which he worked while employed by Medline. In fact, Larkin testified that such a situation had occurred and that Medline had chosen not to sue to enforce the restrictive covenant.

Although this Court recognizes that it has the power to narrowly construe a covenant, *see, House of Vision v. Hiyane*, 37 Ill.2d 32, 225 N.E.2d 21 (1967), this Court declines to do so in this case. Under Illinois law, the validity of a restrictive covenant depends upon the reasonableness of its terms and their effect upon the parties to the contract and the public. *Id.*, 37 Ill.2d at 37, 225 N.E.2d at 24. The restrictive covenant in this case is excessive; Medline made no attempt to reasonably draft the covenant to protect any of its interests. The breadth of this restrictive covenant allows Medline to selectively enforce it while providing the ex-employee with no accurate indication of his post-employment rights. Enforcing excessive restrictive covenants encourages employers to draft such covenants knowing that they could expect at least partial enforcement. Such a policy puts an employee at a serious disadvantage. The employee is either forced to compete with his former employer and hope that the employer selectively will choose not to enforce a restrictive covenant or the employee must litigate to determine the nature of his post-employment rights. *Id.*, 37 Ill.2d at 39, 225 N.E.2d at 25 (1967).

### 2) An Inadequate Remedy at Law

 Medline claimed that it had no adequate remedy at law because it faced a substantial diversion of its customer base from Medline to Continental because of Grubb's alleged activities. Medline conceded that damages could compensate them for actual lost profits; however, they could not be compensated for the injury to their customer relationships and their loss of good will.

Medline did not call any of its customers to substantiate its claims of diversion or lost good will. It chose to rely upon the testimony of Larkin, its corporate vice-president of sales and, Nelson, its current divisional sales manager for the West Coast. Larkin had no knowledge regarding any diversion of business from Medline to Continental. And, Nelson only had personal knowledge regarding one account and that testimony only concerned the damages Medline arguably incurred due to Grubb's alleged activities.[9] In fact, the majority of Nelson's testimony demonstrated that Medline shared its customers with other com-

---

9. Nelson testified that he has renegotiated a contract with and lowered his prices to one customer, St. Joseph's Hospital. However, Medline's counsel was unable to elicit any testimony from Nelson which would connect the need to renegotiate with Grubb's activities on behalf of Continental.

petitors. Because Medline presented no evidence that Grubb diverted customers from Medline to Continental or that Medline suffered any loss of good will due to Grubb's activities, this Court concludes that Medline has not demonstrated that it has an inadequate remedy at law.

### 3) Irreparable Harm

■ Medline asserted that it was being irreparably injured because of Grubb's use of confidential information to solicit Medline customers on behalf of Continental. However, this Court previously found that the information to which Grubb was privy was not confidential. Furthermore, Medline's own witnesses were unable to demonstrate that Grubb retained or used any Medline information. Contrary to the allegations of Medline's complaint, Medline's witnesses demonstrated that Grubb did return the information which Medline contends Grubb is using to undercut them. Because we find that the information to which Grubb was privy was not confidential and, that, in any event, he returned the information to Medline, we conclude that Medline has not demonstrated that it has suffered any irreparable harm.

### 4) The Balance of Hardships Favors Denying the Temporary Restraining Order

■ In this case, the balance of hardships favors the denial of the temporary restraining order. The restrictive covenant, as written, is so broad that it would preclude Grubb from plying his trade in any territory that Medline does business regardless of whether Grubb ever solicited customers on behalf of Medline in that territory. Medline is in a position to selectively enforce the covenant. If it feels threatened enough by its ex-employee's behavior, as it did in this case, it will sue to enforce the covenant. However, if it does not feel threatened, it will not sue. Conversely, as this Court previously stated, Grubb must either ply his trade and hope that Medline will not sue to enforce the covenant or he must litigate the enforceability of the overbroad restrictive covenant.

Medline has not demonstrated that it will suffer any hardship if the motion for a temporary restraining order is denied. The record in this case is curiously lacking any evidence of damage. Medline did not call a single customer to testify that Grubb had solicited their business. Medline also did not call Grubb to question him about his solicitation activities. Instead, Medline chose to rely on speculation, conjecture and the mere possibility that Grubb used confidential information to undercut Medline's bids. Accordingly, this Court finds that the balance of hardships favors denying the temporary restraining order.

### 5) The Public Interest

■ This Court finds that the public interest will be served by refusing to enforce an overbroad restrictive covenant. While it recognizes that in some instances, reasonable, narrowly drawn restrictive covenants are necessary to protect an employer, that is not the case here. Medline asks this Court to hold confidential information which its own witnesses testified is often available for the asking and to enforce a restrictive covenant which is overbroad and selectively enforced by Medline itself. The Court declines to enforce such an agreement.

The Court, based upon the credible evidence of record, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Medline Industries, Inc. is an Illinois corporation with its principal place of business in Mundelein, Illinois.

2. Medline has seven divisions which manufacturer and distribute a full line of health care products. Its divisions service hospitals and health care facilities throughout the United States.

3. Medline's textiles division accounts for 40% of its sales.

4. H. Royal Grubb is a California resident. From May 8, 1982 until his resignation on August 1, 1987, Grubb was employed by Medline.

5. Grubb had sales experience prior to his employment by Medline; however, the experience was not obtained in textiles sales.

6. From June 1, 1984 to August 1, 1987, Grubb performed services for Medline in his capacity as a divisional sales manager for the western division, which included the states of California, Nevada, Oregon and Washington.

7. Medline requires its sales representatives to sign an employment agreement which contains a restrictive covenant. Specifically, the sales representative agrees that for one year following the termination of his employment with Medline, he will not "solicit orders from, sell or render services to any customer solicited, sold, or serviced by [the employee] in the course of his employment by Medline."

8. When Medline employed Grubb in 1982, Grubb signed the standard sales representative's agreement.

9. Medline requires it sales managers to sign an employment agreement which contains a broader restrictive covenant. Specifically, Medline's sales managers agree that "for one year after the termination of the Agreement, [the sales manager will] not participate in a business that offer[s] 'products or services to customers of Medline in the territory managed by' [the sales manager]; ... that [the sales manager] 'will keep confidential all information relating to the conduct and details of Medline's business,' and ... that [the sales manager] 'will not enter into any agreements with or solicit the employees of Medline' to take employment with a competitor of Medline."

10. The employment agreement provides that it shall be construed in accordance with Illinois law.

11. When Medline promoted Grubb in 1984, Grubb signed the standard sales manager's employment agreement.

12. When Medline employs a sales representative-trainee, it provides the representative with a three-week course of training. During the training, the representative attends seminars about each of Medline's divisions and their products, receives "on-the-job" training whereby the representative calls upon customers with an experienced Medline trainer and receives information regarding Medline's products, prices and current customers.

13. In addition to its training course, Medline provides its sales force with computer analyses of its history of sales to particular customers. The analyses include product and price information. Sales representatives receive information for the customers upon whom they call. Divisional sales managers receive the computer analyses for each sales representative under their supervision. These computer analyses are updated quarterly and bi-annually.

14. Medline does not require its sales representatives or sales managers to return the quarterly or bi-annual computer analyses once they are updated.

15. When a sales representative terminates his employment with Medline, they are given a checklist of items which must be returned to Medline.

16. Medline does not give a checklist of items to be returned to Medline when a sales manager terminates his employment with Medline. Medline does not contractually require its sales managers to return confidential information.

17. The names of some potential customers are published each year in the Association of Western Hospitals' Healthcare Directory.

18. Some customers purchase textile products through an open bidding procedure. Once the bid is awarded, the information contained in the bids becomes public information.

19. Medline participates in the open bidding procedure for some of its customers.

20. Product and pricing information can sometimes be obtained from textile customers.

21. Medline executes dual contracts with some of its customers, whereby it and another competitor agree to provide textiles at particular prices.

22. The information contained in the computer analyses is generally available either because it is a matter of public record or it is contained in a dual contract or it is available from the textile customers.

23. After Grubb left Medline's employ, he returned computer printouts, a personal computer and the operating manuals and dictation tapes regarding the sales representatives under his supervision.

24. Medline has selectively enforced the restrictive covenant contained in the sales manager's employment contract.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332(a)(1).

2. The law of the State of Illinois governs this action. *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1080 (7th Cir.1986).

3. Under Illinois law, the restrictive covenant contained in the sales manager's employment contract is unenforceable because it is geographically overbroad. *House of Vision v. Hiyane*, 37 Ill.2d 32, 225 N.E.2d 21 (1967).

4. Medline's investment in its customer base, in terms of time and money, does not give rise to a protected interest. *Medtronic, Inc. v. Benda*, 689 F.2d 645 (7th Cir. 1982).

5. Medline failed to meet its burden of proof on its motion for a temporary restraining order. *Brunswick Corp. v. Jones*, 784 F.2d 271 (7th Cir.1986); *U.S. v. Phillips*, 527 F.Supp. 1340 (N.D.Ill.1981).

## DECISION

The motion of plaintiff, Medline Industries, Inc., for a temporary restraining order is DENIED.